# 25-1538-cv

## United States Court of Appeals

### for the

### Second Circuit

JENNIFER ECKHART,

*Plaintiff-Appellant,*

CATHY AREU,

*Plaintiff,*

– v. –

FOX NEWS NETWORK, LLC, ED HENRY, in his individual capacity and in his professional capacity,

*Defendants-Appellees,*

SEAN HANNITY, in his individual capacity and in his professional capacity, TUCKER CARLSON, in his individual capacity and in his professional capacity, HOWARD KURTZ, in his individual capacity and in his professional capacity,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REDACTED BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

MICHAEL J. WILLEMIN
JEANNE M. CHRISTENSEN
WIGDOR LLP
85 Fifth Avenue, 5th Floor
New York, New York 10003
(212) 257-6800

*Attorneys for Plaintiff-Appellant*

CP COUNSEL PRESS (800) 4-APPEAL • (383405)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

JURISDICTIONAL STATEMENT ....................................................................... 5

STATEMENT OF THE CASE ............................................................................... 5

ISSUES PRESENTED ........................................................................................... 7

STATEMENT OF FACTS ..................................................................................... 7

I.      ECKHART IS SEXUALLY ASSAULTED AND RAPED ........................... 7

        A.      Henry Engages in Non-Consensual Sex with Eckhart .......................... 7

        B.      Henry Sexually Assaults Eckhart ........................................................ 9

        C.      Henry Rapes Eckhart ........................................................................ 10

II.     HENRY EXERCISED MANAGERIAL OR SUPERVISORY
        RESPONSIBILITY .................................................................................... 11

III.    FOX NEWS KNEW THAT HENRY WAS A SIGNIFICANT RISK
        AND EMPOWERED HIM TO RAPE ECKHART ..................................... 12

        A.      Henry Was Known to Have Engaged in Sexual Misconduct ............. 12

        B.      Fox Put Henry in Position to Rape Eckhart ....................................... 15

IV.     FOX NEWS CONDONED HENRY'S CONDUCT BY FAILING TO
        INVESTIGATE SUBSEQUENT COMPLAINTS ABOUT HIM ................ 17

V.      FOX NEWS HAS A HISTORY OF BURYING ITS HEAD IN THE
        SAND WHEN IT COMES TO SEXUAL HARASSMENT AND
        ASSAULT ................................................................................................. 20

        A.      Background ...................................................................................... 20

B.     Fox News Repeatedly Failed to Appropriately Investigate and Remedy Sexual Misconduct Complaint ...................................21

C.     Fox News' HR Personnel Are Not Empowered to Combat Sexual Misconduct ...........................................................................23

ARGUMENT ...........................................................................................................25

I.     LEGAL STANDARD ...................................................................................25

II.     THE COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM UNDER THE NYCHRL ...........................................................................26

     A.     Courts Must Broadly Construe Claim Under the NYCHRL ..............26

     B.     The Lower Court Failed to Apply the Appropriate Standard for Vicarious Liability Under the NYCHRL .............................................29

     C.     There Is Sufficient Evidence that Henry Exercised Supervisory or Managerial Responsibility at Fox News .........................................32

     D.     There is Sufficient Evidence that Henry Exercised Supervisory or Managerial Responsibility Over Plaintiff ......................................38

     E.     Fox News Is Independently Liable Under § 8-107(13)(b)(2) or (3) .....................................................................................................39

     F.     Fox News Is Liable for a Hostile Work Environment Because It Continued After Formal Complaints Were Made ..............................46

III.     THE COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM UNDER THE NYSHRL ...........................................................................49

CONCLUSION ......................................................................................................51

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ................................................................26

Bennett v. Health Management Systems, Inc.
   92 A.D.3d 29, 38 (1st Dept. 2011) ........................................28

Christianson v. Colt Indus. Operating Corp.,
   486 U.S. 800 (1988) ................................................................39

Donoghue v. Oaktree Specialty Lending Corporation,
   2024 WL 3455292 (SDNY June 20, 2024) .................... 45, 46

Dyer v. MacDougall,
   201 F.2d 265 (2d Cir. 1952) ..................................................45

Eckhart v. Fox News Network, LLC,
   No. 20 Civ. 5593 (RA), 2025 WL 786536 (S.D.N.Y. Mar. 12, 2025) ............2, 31

Eckhart v. Fox News Network, LLC,
   No. 20 Civ. 5593, 2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021) ................. passim

Forrest v. Jewish Guild for the Blind,
   3 N.Y.3d 295 (3rd Dep't 2004) ..............................................49

Forsyth v. Fed'n Emp't and Guidance Serv.,
   409 F.3d 565 (2d Cir. 2005) ..................................................26

Johnson v. Killian,
   680 F.3d 234 (2d Cir. 2012) ..................................................26

iii

Martin v. Nieuw Amsterdam Property Management, LLC,,
  No. 22 Civ. 03506 (ARR) (TAM), 2025 WL 1504124 fn. 3 ..............................45

Melendez v. New York City Transit Auth.,
  204 A.D.3d 542 (1st Dep't 2022)........................................................................42

Melendez v. New York City Transit Authority,
  No. 159390/2013, 2021 WL 2627513 (N.Y. Sup. Ct. June 24, 2021).......... 41, 42

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
  715 F.3d 102 (2d Cir. 2013) ......................................................................... 26, 27

Morse v. Fidessa Corp.,
  750 F.2d 223 (2d Cir. 1984) ...............................................................................27

Overton v. N.Y. State Div. of Mil. & Naval,
  373 F.3d 83 (2d Cir. 2004) .................................................................................26

Samuels v. Urb. Assembly Charter Sch. for Comput. Sci.,
  No. 23 Civ. 1379 (RA), 2024 WL 4008165 (S.D.N.Y. Aug. 30, 2024) ..............27

Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,
  391 F.3d 77, 83 (2d Cir. 2004). ...........................................................................26

Zakrzewska v. New Sch.,
  14 N.Y.3d 469 (2010)....................................................................... 29, 30, 31

**Statutes**

18 U.S.C. § 1591 ....................................................................................................1

28 U.S.C. § 1291 ....................................................................................................5

28 U.S.C. § 1331 ....................................................................................................5

28 U.S.C. § 1343 ..................................................................................5

42 U.S.C. § 2000 ..................................................................................1

N.Y. Exec. Law § 290 .......................................................................1, 6

N.Y.C. Admin. Code § 8................................................................. 1, 7, 30

**Rules**

Fed. R. Civ. P. 56 ...............................................................................26

## PRELIMINARY STATEMENT

In July 2020, Plaintiff-Appellant Jennifer Eckhart ("Eckhart") filed suit against Fox News Network, LLC ("Fox News") and Ed Henry ("Henry"), who was formerly one of Fox News' most prominent and influential anchors. In short, Eckhart alleged that Henry subjected her to sex trafficking and sexually harassed, sexually assaulted and raped her in violation of the common law and the New York City Human Rights Law ("NYCHRL"), § 8-107, *et seq.* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), federal sex trafficking laws, 18 U.S.C. § 1591, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), the Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 8-901, *et seq.* ("GMVA") and New York Civil Rights Law, N.Y.C. Admin. Code §§ 52-b, *et seq.* ("CRL § 52"). Eckhart further alleged that Fox News was vicariously liable for Henry's conduct under the NYCHRL and the New York State Human Rights Law ("NYSHRL"). After years of discovery, both Fox News and Henry filed motions for summary judgment. The lower court denied Henry's motion with respect to Eckhart's claims for sex trafficking, gender-motivated violence, assault, battery and a hostile work environment under the NYCHRL. However, the lower court granted Fox News' motion for summary judgment after determining that it could not be held vicariously liable for Henry's conduct. In granting Fox News' motion, the lower court made multiple significant errors that require reversal.

1

First, the lower court disregarded the plain language of NYCHRL § 8-107(13)(b)(1) ("§ 8-107(13)(b)(1)"). Specifically, the NYCHRL provides for vicarious liability where the harasser is an "employee or agent [who] exercised managerial or supervisory responsibility." The statute *does not* require that the harasser exercise managerial or supervisory responsibility over the plaintiff. Nevertheless, in describing the relevant statutory provision, the lower court added this nonexistent requirement to the end of it: "Under the NYCHRL, an employee's harassing conduct may be imputed to his employer only where (1) 'the offending employee 'exercised managerial or supervisory responsibility' **over the victim**." (emphasis added). The words "over the victim" *do not appear in the statute*, and the lower court's unilateral restrictive modification of the statute was not only without basis, but also was carried out in contradiction to its obligation to construe the NYCHRL as broadly as possible.

Second, the lower court compounded this error by departing from its own improper standard and dismissing Eckhart's NYCHRL claims because Henry was not Eckhart's "manager" or "supervisor" as those terms have been interpreted under federal and state law. Specifically, in holding that Fox News was not liable under § 8-107(13)(b)(1), the lower court relied on a prior decision, on a motion to dismiss, in which it held that "Henry was not Eckhart's manager or supervisor." Eckhart v. Fox News Network, LLC, No. 20 Civ. 5593 (RA), 2025 WL 786536, at *18

2

(S.D.N.Y. Mar. 12, 2025). However, the requirement that Henry be Eckhart's "manager or supervisor" – *i.e.*, an "individual[ ] with ownership interest or supervisors, who themselves[ ] have the authority to hire and fire employees," Eckhart v. Fox News Network, LLC, No. 20 Civ. 5593, 2021 WL 4124616, at *16 (S.D.N.Y. Sept. 9, 2021) ("Eckhart 1"), ***does not exist under the NYCHRL.***

Had the lower court engaged in the proper analysis, *i.e.*, determining if there is a dispute of fact regarding whether Henry exercised any managerial or supervisory responsibilities, it would have been required to deny Fox News' motion. Indeed, there is significant record evidence that Henry, one of the Company's most important employees, did exercise managerial or supervisory responsibilities including, although unnecessary for the purposes of liability under the NYCHRL, over Eckhart.

Third, even assuming that the lower court did not err in its interpretation of § 8-107(13)(b)(1), its decision still must be reversed because it erred in its application of § 8-107(13)(b)(2), which provides that a corporation is vicariously liable for the harassing conduct of coworkers if *any* employee with managerial or supervisory responsibilities knows that the harasser had a predilection for harassment. In this case, there is ample evidence that Fox News was on notice that Henry posed a risk to its female employees, including the fact just months before he raped Eckhart, Fox News required Henry to attend a sex rehabilitation treatment program. Fox News claims that it sent Henry to sex rehabilitation because he had a single, consensual,

3

non-work-related affair. This explanation is preposterous on its face. No employer would force an employee into sex rehab for cheating on his wife with a non-employee. The explanation is even more incredible when considering that in the months before he was sent to sex rehab, Henry *was* sexually harassing junior female employees at Fox News, including sending them unsolicited pictures of his penis and engaging in a "sexting scandal" that was apparently covered up by the D.C. Bureau's management. Fox News claims that it was not aware of Henry's other misconduct, but a jury could easily determine that these self-serving denials are false, particularly given the decision to send Henry to sex rehab.

Fourth, even assuming that the lower court did not err in its interpretation of § 8-107(13)(b)(1) *or* (2), its decision still must be reversed because it erred in its application of § 8-107(13)(b)(3), which provides that a corporation is vicariously liable for the harassing conduct of coworkers if *any* employee with managerial or supervisory responsibilities should have known that the harasser had a predilection for harassment. As described in detailed *supra*, Henry's sexually harassing conduct towards women at Fox News was rampant, open and notorious long before he raped Eckhart. Moreover, Fox News is institutionally apathetic when it comes to matters of sexual harassment and its history of burying claims or sexual harassment, or failing to deal with them adequately, provides additional relevant context for the "should have known" analysis that was ignored by the lower court.

4

Fifth, even assuming that the lower court did not err in its interpretation of § 8-107(13)(b)(1), (2) *or* (3), its decision should still be reversed because the hostile work environment continued beyond the point in time that even the lower court concedes Fox News was on notice of Henry's unlawful harassment of female employees.

Finally, the lower court erred in dismissing Eckhart's claims under the NYSHRL because it condoned Henry's sexually harassing conduct after learning of it.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered final judgment on June 16, 2025 after issuing an order granting Defendant-Appellee's motion for summary judgment on March 12, 2025. A-499-548, 670. Plaintiff-Appellant filed a notice of appeal to this Court on June 17, 2025. A-671.

## STATEMENT OF THE CASE

On July 20, 2020, Plaintiff-Appellant Jennifer Eckhart ("Eckhart") commenced this action against Defendant-Appellee Fox News and Henry ("Henry"). On September 9, 2021, the District Court issued its decision granting in part and denying in part the Defendants' respective motions to dismiss under Rule 12(b)(6).

5

Eckhart 1.  Eckhart filed the operative Complaint (A-108-169) on December 20, 2022.  As is relevant here, Eckhart asserted claims against her former employer, Fox News, for a hostile work environment under the NYCHRL and the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*. ("NYSHRL").[1]  These claims against Fox News were predicated on Eckhart's allegations that she was sexually harassed, sexually assaulted and raped, including on Fox News property and/or in a hotel room paid for by Fox News, by Henry.  (A-108-169).

On September 23, 2024, Fox News filed a motion for summary judgment. The District Court granted Fox News' motion for summary judgment in its entirety. A-499-548.  In the same order, the District Court denied Henry's motion for summary judgment with respect to Eckhart's claims against him for sex trafficking, gender-motivated violence, assault, battery and hostile work environment (sexual harassment) under the NYCHRL, and a trial date was set.  Id.  On June 15, 2025, Eckhart and Henry filed a stipulation of dismissal pursuant to Rule 41(a)(1)(A)(ii). On June 16, 2025, Final Judgment was entered in favor of Fox News.  A-670.  On June 17, 2025, Eckhart filed her notice of appeal.  A-671.

---

[1]     Plaintiff also asserted claims for retaliation and negligence, all of which were dismissed on summary judgment.  Plaintiff does not appeal the dismissal of those claims.

## ISSUES PRESENTED

1.      Did the Court err when it determined that in order for Fox News Network, LLC ("Fox News") to be held vicariously liable for the acts of employees under the New York City Human Rights Law, N.Y.C. Administrative Code ("NYCHRL") §8-107(13)(b)(1), said employee must be the *plaintiff's* "supervisor," despite the language and purpose of the statute, as well as its legislative history, directly contradicting this interpretation.

2.      Is there an issue of fact as to whether Ed Henry ("Henry") "exercised managerial or supervisory responsibilities," which, in turn, would render Fox News liable for his conduct under NYCHRL §8-107(13)(b)(1).

3.      Did Fox News know, or should Fox News have known, that Henry was susceptible of violating the NYCHRL, which, in turn, would render Fox News liable for his conduct under NYCHRL §8-107(13)(b)(2) or (3).

## STATEMENT OF FACTS

I.      **ECKHART IS SEXUALLY ASSAULTED AND RAPED BY HENRY**

   A.      **Henry Engages in Non-Consensual Sex with Eckhart**

Eckhart joined Fox News in January 2013 as an administrative assistant to Liz Claman ("Claman"), the anchor of *Countdown to the Closing Bell* ("*Countdown*"). A-190-91, 387. She was later given a production assistant role, was promoted to a "researcher/booker" role in December 2015 and was further promoted to an

7

associate producer role in August 2018. A-191, 388. Eckhart first met Henry on June 13, 2014, when she was 24 years old. A-238, 407. That day, the two exchanged messages and Henry, who was in New York City ("NYC") at the time, invited Eckhart to meet him in one of Fox News' greenrooms. A-418-19. He asked if Eckhart wanted a picture with him, and the two took a photograph together. A-239, 419. Later that day, Henry wrote to Eckhart, "You are way more beautiful in person." A-239. Thereafter, "[Henry] incessantly blew up [Eckhart's] phone demanding that [she] meet him for a quick drink." A-422. Eckhart was able to make excuses initially to get out of meeting Henry, but, "his communication with [her] persisted and he seemed really adamant." Id. Henry also sent Eckhart sexually suggestive text messages, sexually explicit text messages and photographs, as well as other disturbing and violent pornographic images, GIFs and videos. A-268-69, 423. These actions made Eckhart "super uncomfortable," but she felt pressured to respond to some of them with a favorable response that would appease Henry because she felt she didn't have a choice due to the power imbalance that existed between them. A-269, 424.

After being worn down by his multiple, aggressive advances, Eckhart finally relented and acquiesced to meet Henry for a drink at the Marriott Marquis hotel. A-269, 425. During their meeting, Eckhart told Henry that she had on-air aspirations and wanted to be in front of the camera. A-270, 427. Henry then told Eckhart that

8

he wanted to have another drink in his room, and that he wanted to discuss her career further. A-270, 431. With the expectation that Henry would be giving her advice on or assistance with advancing her career, Eckhart agreed to go to his room. Id. When the two got to Henry's room, he locked the door and forcefully kissed Eckhart, threw her against the wall, quickly undressed her, laid himself on top of her on the bed, and proceeded to have sexual intercourse with her without her consent. Id. After this nonconsensual interaction, Henry, once again, dangled the prospect of career advancement, as he told Eckhart that she was beautiful and that she was wasting her time behind the scenes as a production assistant. A-270, 432. Henry further said that he could put her in the room with really powerful people and decision-makers at Fox News. Id.

### B. Henry Sexually Assaults Eckhart

On September 16, 2015, Henry demanded that Eckhart remove her underwear and put them in an envelope for him to retrieve at her work desk. A-271, 436. Despite her discomfort, Eckhart acquiesced to his demand because she felt that she would be punished professionally if she did not carry out this humiliating task. A-271, 473. Henry retrieved the underwear and directed her to come see him in a Fox News office. Id. While inside of the office, Henry pinned Eckhart against the wall and shoved her head down with his hand. A-271, 437, 440. Henry quickly opened

9

his pants zipper, and physically forced Eckhart to give him oral sex against her will using his hand. Id.

### C. Henry Rapes Eckhart

On February 10, 2017, Henry was in NYC to co-anchor Fox & Friends and was staying at the Omni Berkshire Hotel (paid for by Fox News). A-272, 446; CA-1195-1196. Henry messaged Eckhart and asked her to meet him for a quick drink to discuss her career at a restaurant. Id. When she arrived, Henry – who had only recently been reinstated following a suspension during which he was forced to attend a sex addiction rehab program – boastfully announced to Eckhart that Fox News was going to reward him with his own show. A-272, 449-51. This surprising news upset and confused Eckhart, but also made her even more fearful of Henry because it further emboldened his position of power at the network and her career. Id. Henry told Eckhart that he wanted to bring her on his show. Id. After having one drink, Henry asked Eckhart to discuss his impending promotion and her future at his hotel. Id. Henry assured Eckhart that they would only be going for drinks. A-273, 449-51.

When the two got to Henry's hotel room, Henry forced himself upon Eckhart, ripped her coat and dress off, pinned her against the wall, turned her around and locked her hands behind her back with handcuffs. Id. While naked, restrained and in fear of her life, Eckhart informed Henry that the handcuffs were causing her pain and asked him to remove them, but he refused and laughed at her. Id. Over the

10

course of the following minutes, Henry violently hit and slapped Eckhart in the face multiple times, whipped her entire body with his belt, shoved his fist up her vagina, and forcefully raped her all while restrained against her will in handcuffs. Id. By the end of this rape, Eckhart's wrists were bleeding. Id. She had a bloody lip, whip marks all over her body, and was in a great deal of pain. Id. When Henry was done, Eckhart was finally able to leave the hotel in a severe state of shock, fear and panic, immediately flagged a taxi down to try to get home to safety, and cried herself to sleep that night. Id.

## II. HENRY EXERCISED MANAGERIAL OR SUPERVISORY RESPONSIBILITY

Even before becoming an anchor, Henry had a staff of individuals report to him that consisted of a field producer, a cameraman, and an audio man. A-307, CA-336-338. Henry was responsible for directing the day-to-day tasks and responsibilities of these individuals and had the power to have them removed and replaced if they did not perform up to his expectations. Id. Additionally, as a production assistant, booker and associate producer, it was Eckhart's job to coordinate correspondent and reporter appearances and live TV hits on *Countdown*. Id. This would require Eckhart to take direction from the correspondent or reporter and/or their staff. Id. During her employment, Henry appeared on *Countdown* on multiple occasions, and he and his staff would direct Eckhart as to what elements they needed for his live TV hit. Id. It was Eckhart's job to make sure that Henry's

11

live television appearances were tailored to his specific demands and was acutely aware that she would be disciplined if she failed to comply. Id.

### III. FOX NEWS KNEW THAT HENRY WAS A SIGNIFICANT RISK AND EMPOWERED HIM TO RAPE ECKHART

### A. Henry Was Known to Have Engaged in Sexual Misconduct

In May 2016, Fox News learned that Henry had been carrying on an affair with a Las Vegas stripper. A-192, CA-273, 284. At that time, Fox News pulled Henry off the air, suspended him (with pay) and required him to undergo treatment for sex addiction. A-192; CA-273, 284, 848, 874. Fox News would have the Court believe that it sent Henry to a sex rehabilitation program because of a single consensual affair, but that assertion is not credible or consistent with the record. Indeed, there is record evidence that Henry was engaged in *workplace* sexual misconduct *before* Fox News learned about Henry's affair with, including a "sexting incident" that the "DC Bureau helped Ed cover up." A-293; CA-49, 893, 894-895, 934-1061, 1062-1064, 1065-1066. Henry also reportedly used his Company-issued device to engage in sexting, specifically utilizing WhatsApp (which he made Eckhart download) and Signal because those applications are encrypted. Id. This information was provided to Fox News by ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (who had a sexual relationship with Henry), who thought that Bryan Boughton ("Boughton") (a Senior Vice President and Chief of the DC Bureau) or Michael Clemente ("Clemente") (who, at the time, was an Executive Vice President overseeing all of

12

Fox News' news operations) were involved in the coverup. CA-934-1061, 1062-1064, 1065-1066. ███████ also reported to Human Resources ("HR") that Henry was sleeping with ███████ in the DC Bureau. A-50, 893-895. While these concerns were not formally reported until April 2017, Fox News' decision to suspend and send Henry to sex rehab in 2016 indicates that they knew about some or all of these acts of sexual harassment.

None of these allegations were ever meaningfully investigated. As it turned out, however, many or all of them were true. Henry *was* sleeping with ███████ ███████████████████████████ A-261-63, 469-72; CA-75-77, 1138-1142. This sexual relationship, which involved a similar and severe imbalance of power began in November 2016, after Henry returned from suspension, and pre-dating the February 2017 rape involving Eckhart. Id. ██████ has described Henry as a "predator," who used the "power imbalance" to get her to engage in a relationship – including coercing her to engage in sex acts in Henry's office – that was "predatory," "emotionally abusive" and "not as 'consensual' as [she] thought." CA-809, 1092-1128. Also, prior to the 2017 rape involving Eckhart, Henry sent a picture of his penis to a ████████████████████████████████ A-265-66; CA-1143-1145. The photograph was totally unsolicited and ████ was shocked and upset at having received it. Id. ██████ believes that she told colleagues at Fox News about this unwelcomed sexual harassment in 2016. Id.

13

In sum, it was well-known at Fox News that Henry posed a serious risk to his female colleagues. In 2016, ██████████████████████ told Eckhart that "everyone at Fox News knows that Ed Henry is a sex addict. That's no secret." A-304, CA-118, 336. ████████ reported that when Henry came back from suspension in 2016 "people across DC & NY [ ] reached out to [her] expressing their discomfort and disdain" that Henry was back. CA-107, 934-1066. ████████ also stated that Henry had not changed after graduating from "sex addict's camp" and warned that he would use his position of power to prey on women. Id. ████████████████ ████████████████████ who worked with Henry in the DC Bureau, said that her and others openly discussed Henry's inappropriate behavior towards women at the network, as well as a sexual relationship he was having with a producer in NYC. CA-723-730.

Henry's predilection and reputation for sexual harassment was so widely known amongst the industry such that after this case was filed one of his prior targets tweeted: "No chance @foxnews didn't know about Ed Henry. He was a menace to many of us on the comms side when he was @cnn and everyone talked about it. Literally so so so gross." CA-597-598. Suffice it to say that Fox News' claim that it had no idea that Henry might violate the anti-discrimination laws, and that it sent Henry to a sex addiction program because he had a single consensual extramarital affair with a non-employee, is totally preposterous. What possible reason could Fox

14

News have to force Henry into a sex addition program because he cheated on his wife one a single occasion? Rather, given the record evidence, a reasonable jury could easily conclude that Fox News forced Henry to undergo treatment at a sex addiction program because the Company knew that he posed a risk to his female colleagues, staff and subordinates. *Supra* at pp. 12-13. And despite knowing this, Fox News welcomed him back with open arms, rewarded him by drastically renewing his contract, increasing his pay to ████ per year, promoting him to a highly-coveted anchor role, and *continuing* to enable and turn a blind eye to his actions, effectively condoning his behavior, as the red flags, complaints and the warning signs piled up. *Infra* at p. 17-26.

## B. Fox Put Henry in Position to Rape Eckhart

Prior to his paid suspension, Henry was earning ███ CA-848-9. Then, for a few months, Henry's compensation was cut to ███ Id. However, by the start of 2017, Fox News decided to *increase* Henry's compensation to ███ per year. Id. Fox News continued to increase Henry's compensation and he was earning ███ at the time of his departure. Id. CA-849. His responsibilities also increased over time, as he began hosting Fox and Friends even more often on the weekend and eventually was given an anchor position for America's Newsroom. Id., CA-850.

15

After Henry's suspension, and before he raped Eckhart in February 2017, Fox News began negotiating a contract extension with Henry. CA-846, 316-332. This contract reflects that Henry would be promoted to an anchor position, and Henry testified that he was being considered for that promotion by late-2016. CA-846-847. Henry would reference his impending promotion in furtherance of his rape of Eckhart. CA-829-831. Fox News' treatment of Henry following his return to the network only served to embolden him, as he escalated his abusive treatment of women by not only raping Eckhart, but also sexually assaulting another Fox News colleague, ███████████████████ by attempting to kiss her without her consent and fingering her vagina under a table without her consent. CA-1129-1131. As described by ██████ in a sworn declaration: "At some point, Henry was sitting across from me at a table, and though we had not had a physical encounter in years, he suddenly and very unexpectedly put his hand under the table and under my skirt and fingered me. He did this without my consent . . . I remember feeling considerable distress and confusion." Id.

In addition, while Fox News buried its head in the sand and continued to reward Henry with promotions and increased pay, he sexually harassed a Fox News contributor, Cathy Areu ("Areu"). CA-413-458, 852. Areu was seeking Henry's assistance with getting a job at Fox News. Id. Knowing this, Henry sent her various sexual GIFs and images, including a photograph of a vagina being clamped shut with

16

clothespins, as well as a video entitled "fastest job interview ever," in which an interviewee exposes her vagina to get a job. Id. After sending the latter video, Henry asked Areu if she was available for an interview. Id.

## IV. FOX NEWS CONDONED HENRY'S CONDUCT BY FAILING TO INVESTIGATE SUBSEQUENT COMPLAINTS ABOUT HIM

Shortly after joining Fox News, Head of HR Kevin Lord ("Lord") was approached by ███████████████████████ who had been asked by multiple women to voice concerns about the fact that Henry had been brought back to work at Fox News after the stripper affair. A-234, 292; CA-872-873. Lord promised ███████ that he would speak with top executives at the network, and he did later speak with then-Fox News President Shine. A-292; CA-873-874. Shine explained that Henry had completed treatment at a sexual rehabilitation center, and that was that. Id.

Then, in April 2017, ███████ made the aforementioned reports of: (i) "some covering up of Ed's sexting incidents by the DC team;" (ii) Henry using his Company device for sexting (at no time was his device ever monitored despite Fox News' policies expressly permitting monitoring); (iii) Henry sleeping with ███████ ███████ at the D.C. Bureau; (iv) that "people across DC & NY [had] reached out to [her] expressing their discomfort and disdain" that Henry was back at Fox News and warned that if Henry was given an anchor position he would use his position of power to prey on women;" and (v) that Henry had not changed after graduating from

17

his "sex addict's camp."  A-293; CA- 918-919, 934-1061, 1062-1064, 1065-1066. Henry was not even asked about any of these allegations.  A-294; CA-895-896.

In a panic, Lord lied and claimed at his deposition that IT was brought in to try to determine whether Henry used his Company device or sexting, but there is not one document to support this claim and Lord had no recollection of any outcome into that process (which assuredly never occurred).  A-294; CA-897-898.  As a follow-up to the meeting with ███████ , Lord met with ████████████████ who also reported that Henry sent her a sexually inappropriate communication.  A-282; CA-764-765, 768, 774; 923-924.  Lord conducted no investigation.  A-308; CA-899. Then, on May 22, 2017, ███████ sent an email to, *inter alia*, Lord, Wallace, Bill Sammon ("Sammon") and Boughton.  A-234, 294; CA-930-933.  The email raised a litany of concerns about Henry, including that his return "was demoralizing for the women and protected minorities after the Ailes investigation, and public commitments by the Murdoch's to a culture change" and "showed Ailes' remaining lieutenants would resist the Murdoch's genuine call for and commitment to culture change." CA-930-933.  Finally, ███████ reported that when she raised these issues with Boughton, he told her that "he considered Henry's situation a closed matter, and his view was shared by Shine, Scott, Wallace and Sammon." Id.  In a bullying tone, Boughton told ███████ to "never to raise it again." Id.

18

Fox News did literally nothing to meaningfully investigate the concerns raised in this email from ███████ Lord claimed that he asked his subordinate to engage in "sensing sessions" with employees in the D.C. Bureau. A-238, 296; CA-884-886. However, he was not aware of a single piece of evidence to support the contention that this entirely inadequate process ever even occurred. CA-884-886. He also did not know to whom his subordinate had spoken, and claimed that someone had followed up with ███████ but this also was untrue. Id. Lord never even spoke with his subordinate about anything she was told during these "sensing sessions" and could not remember any details about the supposed investigation. Id. Fox News' eventual response to ███████ stated explicitly that the Company was not going to independently investigate her concerns. CA-1067-1069. No one ever asked Henry a single question regarding the concerns raised by ███████ CA-854-855, 1067-1069.

Years later, to investigate the allegations made by Eckhart, Fox News hired Gregg Gilman ("Gilman") at Davis & Gilbert. CA-835. Gilman's points of contact at Fox News were then-employment counsel, Carl Guida, and then-General Counsel, Lilly Claflee. Id. Guida and Claflee lied to Gilman and told him that no prior complaints of workplace harassment or discrimination had been made against Henry. Id. They also failed to disclose to Gilman the various workplace affairs in which Henry had engaged, the aforementioned "sexting" incident and coverup, the

19

discomfort that multiple women expressed regarding his presence at Fox News, etc. CA-836. Gilman conceded that the aforementioned misconduct would have been relevant to the investigation. CA-838-839. Gilman asked to speak with witnesses, including Lord, but Guida and Claflee did not even bother telling Lord (or any other witness) that Gilman had asked to speak with them. CA-836-837, 902.

## V. FOX NEWS HAS A HISTORY OF BURYING ITS HEAD IN THE SAND WHEN IT COMES TO SEXUAL HARASSMENT AND ASSAULT

### A. Background

The #MeToo movement ignited after former Fox News anchor Gretchen Carlson ("Carlson"), and at least 20 other women, accused then-Fox News Chairman and CEO Roger Ailes ("Ailes"), of sexual misconduct. A-222, 287. Shortly thereafter, Bill Shine ("Shine"), who Fox News installed as Co-President of the Company after Ailes' departure, left Fox News following accusations that he aided and abetted the sexual harassment crimes of Ailes. A-287. Shine's Co-President, Jack Abernathy ("Abernathy"), was also accused of sexual harassment, but remains employed. A-287.

By January 2017, Fox News was aware that anchor Bill O'Reilly ("O'Reilly") had entered into at least six settlement claims of sexual harassment. A-287. One month later, in February 2017 – the same month Eckhart was raped by Henry – Fox News renewed O'Reilly's contract. A-288. Incredibly, when confronted about this

20

by the New York Times, the Company said, "Fox News 'surely would have wanted to renew' Mr. O'Reilly's contract, noting that 'he was the biggest star in cable TV.'" A-288. This is a direct admission that Fox News is willing to retain individuals who – like Henry – are known to engage in unlawful acts of sexual misconduct, so long as they are profitable.

**B.    Fox News Repeatedly Failed to Appropriately Investigate and Remedy Sexual Misconduct Complaints**

The following examples uncovered during discovery demonstrate that Fox News is either aware of sexual harassment and condones it, or willfully turns a blind eye to it.

- Fox Business executive producer Brad Hirst ███████████ ██████████████████████████████ CA-907. ████ was twice accused of sexual harassment at Fox News, including asking interns and production assistants for sexual favors and leering at female subordinates' breasts. CA-737-739, 909, 1070-1071. ██████ remained employed, and during this litigation, a former female colleague submitted a declaration that she was raped by ██████ in his Fox News office. CA-1146-1148. He is still employed.

- A Fox News VP has been the subject of approximately five complaints of discrimination, retaliation and/or hostile work environment. He was never disciplined and remains employed by Fox News. Id. CA-734-737.

- ██████ identified four other victims of sexual harassment. CA-777-778.

- A Reporter made a sexual harassment complaint against ██ ██████████████████████████ CA-748, 749-754, 756,

21

1072-1078. Collins outrageously determined that the allegations were unsubstantiated because the reporter texted flirtatious messages to the ███████████, even though the reporter explained that when she did not submit to his sexually inappropriate comments, he would become angry and retaliate against her. Id. The reporter disclosed this behavior to many managers, all of whom violated their own reporting obligations, but none of which were investigated for doing so. Id.

- Another supervisor openly encouraged his colleagues to look at photographs of yet another female colleague, ████████████████████████████. CA-755. This was reported to Collins but was never investigated even though Collins admitted that the same would be a violation of Fox News' policies. Id.

- In 2011, a Fox News executive was investigated by Collins for sexual harassment and retaliation against an associate producer. CA-113; ECF 427 at Ex. 77. During the course of the investigation, Collins did nothing to prevent the producer from continuing to report to the executive. Collins cleared the executive, who continued to work at Fox News over the course of the next 12 years. Id. He was finally terminated in 2023 when it was discovered that he was a serial sexual harasser and stalker. Id.

- Fox News personality ██████████████ sexually harassed his colleague, ████████████ CA-878. Even though Lord testified that ████████ sent ████████ inappropriate sexual texts, he had no recollection of whether █████ (who plays a very prominent on-air role on Fox News to this day) was disciplined at all. Id.

- In November 2017, a reporter was accused of sexual harassment by a female journalist. CA-1081-1083. He admitted to the sexual harassment, including physical touching and attempting to force the journalist to kiss him. Id. HR did nothing but tell this individual that they "did not want to have this conversation again." Fox News was

22

later forced to fire this individual when it learned that he sexually harassed at least three different woman – and that the media was going to report on the same. CA-114.

• In December 2017, a female producer filed a complaint with Lord about uncomfortable and sexually harassing behavior by one of the Company's male bookers. CA-1084-1085. The only action that was taken is that the booker was told to stop making advances towards women on his floor. Id.

• In July 2019, an associate producer made an HR complaint against an editor who made sexually inappropriate comments and advances, including telling her that she was hot and that he had a crush on her. CA-1086-1091. When she explained that she had a girlfriend, the editor asked whether she was bisexual and told her he was lusting for her. Id. The editor admitted this (and additional) outrageous behavior, but was not terminated. Id. Lord said that he was going to look into this decision after his deposition, but the editor remains employed by Fox News. CA-115, 903.

## C. Fox News' HR Personnel Are Not Empowered to Combat Sexual Misconduct

During the relevant time period, Denise Collins ("Collins") was the Senior HR professional at Fox News. CA-15. Yet, she claims to have been unaware of a single complaint of sexual harassment that had been brought against Ailes or O'Reilly during her tenure. CA-744-746. This is a stunning admission given that those two were alleged to have sexually harassed at least 30 women during Collins' tenure. A-287-288. Obviously, Fox News' parent company, 21st Century Fox (now Fox Corporation), was actively involved in concealing sexual harassment at Fox

News from Fox News' *own* HR personnel. As such, it is not surprising that during the relevant period employees were at a loss as to how to make complaints of sexual misconduct. As Fox News on-air personality ███ testified, prior to January 2017, "[t]here was no place to really report the behavior . . . [t]here was no real HR or avenue where we could report the behavior." CA-771-772. She added that employees at Fox News "weren't told where to go, if [they] had complaints of sexual harassment." Id.

In January 2017, Fox News hired Lord to oversee HR at Fox. CA-863. Lord was ostensibly hired to help grow the HR function, make it more visible within the organization and give a fresh set of eyes to recruitment, development, training and sexual harassment complaint procedures. CA-870. As to the latter, one of the goals was to build a more robust HR team so that employees would know how to complain about harassment – a tacit admission that Fox News' polices to that point were lacking. CA-871. Once employed, Lord was cut out of all involvement with Fox News' decision to extend O'Reilly's and Henry's employment contracts despite the obvious HR concerns posed by those two individuals. CA-875, 877.

After Ailes was terminated, an outside law firm, Paul Weiss, was hired to conduct a "sweeping" investigation into Fox News' culture and complaints of sexual harassment. CA-745. Not one policy change was made at Fox News as a result of Paul Weiss' investigation. CA-757. HR's Collins testified that during the Paul

24

Weiss investigation she did not "notice any change" in the environment at Fox News other than Ailes' departure. Id. Lord subsequently testified that he was not aware of a single person who was disciplined as a result of the investigation. CA-905.

Last, but not least, in June 2021 Fox News agreed to be fined a *record* $1,000,000 by the NYC Commission on Human Rights (the "Commission"), after the Commission initiated its own investigation into a series of high-profile reports alleging a culture of pervasive sexual harassment and retaliation at the network. NYC Commission on Human Rights Announces Landmark $1,000,000 Sexual Harassment Settlement, June 29, 2021; ECF 426 at Ex. 81. The agreement requires Fox News to hold regular sexual harassment training and implement an approved policy and complaint procedure for reporting of discrimination and harassment complaints that allows for multiples levels of reporting. Id. Obviously, this agreement would never have been necessary if Fox News had adequate training and proper complaint procedures in place.

## ARGUMENT

## I. LEGAL STANDARD

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). Such a dispute qualifies as

25

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248(1986).

All evidence must be viewed "in the light most favorable to the non-moving party," Overton v. N.Y. State Div. of Mil. & Naval Affs., 373 F.3d 83,89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d77, 83 (2d Cir. 2004). Summary judgment is appropriate in NYCHRL cases, "only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." Id. (citation omitted). Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 113 (2d Cir. 2013).

This Court reviews *de novo* a grant of summary judgment, applying the same standards of those applied by the District Court. Forsyth v. Fed'n Emp't and Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005), abrogated on other grounds by Ledbetter v. Goodyear Tire and Rubber Co., Inc., 550 U.S. 618 (2007).

## II. THE COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM UNDER THE NYCHRL

### A. Courts Must Broadly Construe Claims Under the NYCHRL

For years, the NYCHRL was construed to be coextensive with its federal and state counterparts. Mihalik, 715 F.3d 102, 108–09 (citations omitted). In 2005, however, the New York City Council amended the NYCHRL by passing the Local

26

Civil Rights Restoration Act of 2005 (the "Restoration Act"). <u>Id.</u> By passing the Restoration Act, the City Council made the "[t]he NYCHRL [ ] a 'one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall.'" <u>Samuels v. Urb. Assembly Charter Sch. for Comput. Sci.</u>, No. 23 Civ. 1379 (RA), 2024 WL 4008165, at *7 (S.D.N.Y. Aug. 30, 2024) (quoting <u>Mihalik</u>, 715 F.3d at 109. Moreover, in determining claims under the NYCHRL, its provisions are required to "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" and "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." <u>Id.</u> (quotations and citations omitted). The First Department has acknowledged that the City Council has "expressed a very specific vision: a Human Rights Law designed as a law enforcement tool with no tolerance for discrimination in public life." <u>Morse v. Fidessa Corp.</u>, 165 A.D.3d 61, 65 (1st Dept. 2018) (emphasis in original).

The court in <u>Morse</u> held that, given the direction of the City Council, "courts must [] play a highly active role in the development of the City HRL by interpreting all cases in a manner consistent with the goal of providing unparalleled strength in deterring and remedying discrimination." <u>Id.</u> at 67. The First Department has also made clear that having juries decide the merits of discrimination claims, rather than

27

courts, ensures that the spirit and intent of the City Law is fulfilled. As the Court noted in <u>Bennett v. Health Management Systems, Inc.</u>

> [T]he existence of discrimination – a profound evil that New York City, as a matter of fundamental public policy, seeks to eliminate – demands that the courts' treatment of such claims maximize the ability to ferret out such discrimination, not create room for discriminators to avoid having to answer for their actions before a jury of their peers.

92 A.D.3d 29, 38 (1st Dept. 2011).

Any interpretation of the NYCHRL that would relieve Fox News of a trial under the circumstances of this case would without doubt be contrary to the intent and letter of the law. This is particularly clear given that during the pendency of this action, the NYC Commission on Human Rights – the agency tasked with enforcing the NYCHRL – initiated its own investigation into a series of high-profile reports alleging a culture of pervasive sexual harassment and retaliation at Fox News. *Supra* at pp. 25-26. This investigation concluded with an agreement that Fox News pay a record $1,000,000 fine and improve its sexual harassment training and policies. <u>Id.</u> It is inconceivable that in passing the NYCRHL and Restoration Act that the City Council intended for a company with Fox News' record of apathy towards, and enablement of, sexual misconduct in the workplace to be relieved of liability when one its biggest talents – someone who was known to pose a risk to female employees – sexually assaults and rapes a women on company property and in a hotel room paid for by the company, respectively.

28

**B.      The Lower Court Failed to Apply the Appropriate Standard for <u>Vicarious Liability Under the NYCHRL</u>**

Under the NYCHRL, "[a]n employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

(1)      [T]he employee or agent exercised managerial or supervisory responsibility; or

(2)      [T]he employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

(3)      [T]he employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct."

§ 8-107 (13)(b)(1)-(3).

Accordingly, under the NYCHRL, an employer is strictly liable for the unlawful harassment of employees by any employee – or even a nonemployee "agent" – who "exercises" some managerial or supervisory responsibility.  <u>See</u> <u>Zakrzewska v. New Sch.</u>, 14 N.Y.3d 469, 477 (2010) (quoting N.Y.C. Admin. Code § 8–107(13)(b)(1)).  Under the plain language of the statute, the harasser need not be a "supervisor," much less the plaintiff's supervisor; indeed, he need not even be employed by the corporate employer.  Rather, the employer is strictly liable for

29

sexual harassment by any "*employee* or agent" who "exercised managerial *or* supervisory responsibility." N.Y.C. Admin. Code § 8-107(13)(b)(1) (emphasis added). As such, summary judgment cannot be granted if there is some evidence that the harasser exercised some supervisory *or* managerial responsibilities, even if such responsibilities did not render the harasser a "supervisor" as that term is interpreted under federal or state law.

Despite the plain language of the NYCHRL, and the obligation to interpret the statute as broadly as possible, the District Court improperly concluded that pursuant to § 8-107 (13)(b)(1), Henry needed to exercise managerial or supervisory responsibility "over the victim" (*i.e.*, Eckhart) for Fox News to be liable for his unlawful conduct, and that Fox News was not liable because Henry was not *Eckhart's* manager or supervisor:

> Under the NYCHRL, an employee's harassing conduct may be imputed to his employer only where (1) "the offending employee 'exercised managerial or supervisory responsibility'" **over the victim**.

A-535 (emphasis added). Although the district court cited to <u>Zakrzewska</u>, the decision does not use the phrase "over the victim." It quotes the provision verbatim and refers to the Report of the Council's Committee on General Welfare that describes the new section 8-107 (13) as providing for "[s]trict liability in employment context for acts of managers and supervisors; also liability in employment context for acts of co-workers where employer knew of act and failed

30

to take prompt and effective remedial action or should have known and had not exercised reasonable diligence to prevent." Zakrzewska, 14 N.Y.3d at 480 (quoting 1991 NY City Legis Ann, at 187). The Court of Appeals even found that "the School's argument that section 8-107 (13) does not apply to all managers and supervisors is not supported by the statute's text." Id. at 481.

What is worse, the District Court ultimately compounded its error by dismissing Eckhart's NYCHRL claims because Henry was not Eckhart's "manager" or "supervisor" as those terms are defined under federal and state law. Specifically, in holding that Fox News was not liable under § 8-107(13)(b)(1), the lower court relied on a prior decision, on a motion to dismiss, in which it held that "Henry was not Eckhart's manager or supervisor." Eckhart v. Fox News Network, LLC, No. 20 Civ. 5593 (RA), 2025 WL 786536, at *18 (S.D.N.Y. Mar. 12, 2025). However, the requirement that Henry be Eckhart's "manager or supervisor" – i.e., an "individual[ ] with ownership interest or supervisors who themselves[ ] have the authority to hire and fire employees," Eckhart 1, 2021 WL 4124616, at *16, ***does not exist under the NYCHRL.***

As such, the lower court added to § 8-107(13)(b)(1)'s corporate liability standard in two ways. First, it required Eckhart to show that Henry was a "supervisor," rather than that he merely exercised some supervisory or managerial

31

responsibility. Second, it required her to show that Henry was *her* supervisor. Both errors independently and collectively require reversal of the lower court's decision.

## C. There Is Sufficient Evidence that Henry Exercised Supervisory or Managerial Responsibility at Fox News

Had the lower court applied the correct standard – *i.e.*, whether there was evidence to show that Henry exercised supervisory or managerial responsibility over any employee – it would have denied Fox News' motion.

Under the broad interpretation required by the NYCHRL, ample evidence exists that Henry exercised some managerial or supervisory responsibility sufficient to satisfy the definition under § 8-107(13)(b)(1). Eckhart testified that she met Henry in June 2014 when she was 24; Henry, then Chief White House Correspondent at Fox News, was 46. A-268; CA-815. Despite Henry sending her sexually explicit text messages, and unsolicited pornographic images and videos which depicted "women getting slapped" and "abused," Eckhart felt pressured to favorably respond to some of them to appease Henry because she felt she didn't have a choice due to the power imbalance that existed between them. A-269, CA-814-815. In her words, Eckhart "was a young girl, just starting her journalism career and [ ] did not feel [she] was in a position of power to tell the chief White House correspondent of Fox News that [she] was uncomfortable with the material he was sending [her]." Id. When she agreed to meet him for a drink, Henry said he wanted to discuss Eckhart's career. Eckhart testified that after he sexually assaulted her in 2015, Henry dangled

32

the prospect of career advancement, and said she was wasting her time behind the scenes as a production assistant. A-270; CA-820. Henry said that he could put her in the room with really powerful people and decision-makers at Fox News. Id. Subsequently, on September 16, 2015 when Henry demanded that Eckhart remove her underwear and put them in an envelope for him to retrieve at her work desk, she did so because she felt that she would be punished professionally if she did not carry out this degrading and humiliating task. CA-821-822. She testified that when Henry called her up to his office on the 17th floor, she went out of fear of retaliation and even tried to leave immediately. CA-823. In the office, Henry pinned Eckhart against the wall and shoved her head down, opened his pants zipper, and physically forced Eckhart to give him oral sex against her will using his hand. Regarding a playlist of songs with sexual titles that Eckhart sent to Henry in January 2016, she says that she sent it "under threat" because she was "in fear" of losing her job. CA-825. She testified that she "was scared that if [she] didn't tell him what he wanted to hear, [she] would get punished both physically and professionally." Id.

Eckhart's testimony that she considered Henry able to punish her professionally, which reasonably includes an adverse impact on the terms and conditions of her employment, is relevant to the question under the NYCHRL regarding Henry's exercise of some supervisory authority. Eckhart testified that Henry was in a "position of power," "superior to her" within the organization and

33

"had a lot of influence with superiors at the Company." CA-809. She never argued that this ability was exclusive to her because he managed her directly; rather, she argued that Henry's position was at such upper levels that of course he had the ability to impact a junior employee like Eckhart. After all, Henry was accountable to the handful of people at Fox News at the very top, including Shine, Wallace and Scott. Given the evidence in the record about how valued Henry was by the top executives, Eckhart's belief was reasonable and valid. Eckhart further testified that on February 10, 2017 when Henry first invited her to his hotel while he was in NYC to co-anchor Fox & Friends, that he wanted to discuss her career. CA-828. Henry boasted to her that Fox was going to give him his "own show" and that he wanted to bring her on it. CA-829-831. Eckhart testified that such news made her even more fearful of Henry because it further emboldened his position of power at the network and her career. CA-829. She testified that when they got to Henry's hotel room, Henry forced himself upon Eckhart, ripped her coat and dress off, pinned her against the wall, turned her around and locked her hands behind her back with handcuffs. CA-829-831. Henry violently hit and slapped Eckhart in the face multiple times, whipped her entire body with his belt, shoved his fist up her vagina, and forcefully raped her all while restrained against her will in handcuffs. Id.

Eckhart correctly understood Henry's power and authority at Fox News. Being an on-air host/anchor is one of the most coveted positions at Fox News. Henry

was the Chief White House Correspondent, promoted to Chief National Correspondent and was a regular fill-in host on Fox & Friends, one of the networks most successful shows. By late 2016 he was in active negotiations for a contract that promoted him to "anchor/co-anchor and Chief National Correspondent and in any other related capacity at Fox." CA-847.

Henry's compensation also supports his top level status and influence at the company. In 2015-16, Henry was paid ███████ a year. *Supra* at p. 15. In 2017, Henry was paid ███████ a year and later increased to ███████. *Supra* at p. 15. In 2014 Henry was the Chief WH Correspondent, and already appeared on many of Fox's highest rating shows, including Fox & Friends. *Supra* at p. 10. Eckhart's job required her to book Henry when he appeared on the Countdown, and therefore she personally interacted with Henry and employees who reported to him. *Supra* at p. 11. Eckhart can testify about her first-hand interactions with Henry, as well as his field producer, cameraman, and audio man. *Supra* at p. 11.

Based on this first-hand knowledge, Eckhart testified that she had to take direction from Henry and his staff. She further witnessed the work performed by Henry's staff, his field producer, cameraman, and audio man, who she says reported to him, as part of her work coordinating the reporting for his appearances on the *Countdown*. *Supra* at p. 11. She should be entitled to tell a jury what she experienced and observed regarding the operation of his team, including that Henry

35

gave direction to his field producer, cameraman, and audio man. She also is entitled to tell a jury that it was her job to make sure that Henry's live television appearances were tailored to his specific demands and that she was acutely aware that she would be disciplined if she failed to comply. *Supra* at p. 11. Such evidence, when viewed in a light most favorable to Eckhart the nonmoving party, is more than sufficient for a jury to decide that Henry satisfied the requirements of §8-107(13)(b)(1).

Fox News claimed that Eckhart's statements about her own experiences and observations are inadmissible because Eckhart did not witness his "interactions with staff *on his show*" and thus she lacks personal knowledge about whether Henry "exercised supervisory authority over others." This is illogical. If Eckhart observed him direct other employees as part of appearing as a guest on someone else's show, then it is even more likely than not that he exercised some management when he hosted his own show. Moreover, Eckhart's years of employment and observations as a producer at Fox News provide sufficient foundation for her claims regarding Henry's responsibilities.

It is unimaginable that an employee being paid ▮▮▮▮▮ a year and who had the title "Chief White House" or "Chief National Correspondent" did not have any managerial or supervisory responsibility over a single employee. If Fox is to be believed, Henry worked in a vacuum, unable to manage his field producer, cameraman, and audio man or anyone else involved with writing and filming content

36

for his live reporting. Had the district court properly considered such evidence of Henry working in a position where he undoubtedly performed some supervision over other employees, it would have arrived at a different result pursuant to § 8-107(13)(b)(1).

Moreover, Henry's testimony that "no one" reported to him and "I didn't handle anyone's promotion," is contradicted by his own admissions about his influence in the promotions of other employees. For example, Henry admitted that in late 2016 he began having an affair with ███████████████ He testified that he tried to help her get a promotion, "[I] put in, you know not a formal recommendation, but as you say 'a word.'" CA-280. Henry said he put in the "word" because ██████ boss was "particularly tough on the young women." Id. Based on his testimony, Henry believed that he had at least some level of influence regarding potential promotions.

Taking the above facts in the light most favorable to Eckhart, more than ample evidence exists to find that Henry's elite status as an on-air chief correspondent and host/anchor, could show that he exercised some managerial or supervisory responsibility at Fox News under §8-107(13)(b)(1). As such, the lower court erred in granting Fox News' motion for summary judgment with respect to Eckhart's NYCHRL hostile work environment claim.

37

**D.    There Is Sufficient Evidence that Henry Exercised Supervisory or Managerial Responsibility Over Plaintiff**

Even assuming, *arguendo*, that Eckhart was required to show that Henry exercised "supervisory or managerial responsibility" *over her* – and she is not – for many of the reasons described *supra* at p. 11, including his influence at the network and professional and personal interactions with Eckhart, the lower court should have denied Fox News' motion.  Instead, the District Court found that Plaintiff waived her right to argue that Henry exercised supervisory or managerial responsibility over her because it had previously decided, *on a motion to dismiss without opposition on this point*, that Henry was not Eckhart's "manager or supervisor," and that Eckhart did not move for reconsideration of that decision.  A-536.

The claim of waiver is misplaced.  In opposition to Fox News' motion to dismiss, Plaintiff argued that the operative pleading stated a claim for liability under §8-107(13)(b)(2) or (3) (discussed further below).  There was no requirement for Plaintiff to also argue that Henry was her "supervisor," particularly given that no provision of the NYCHRL requires Henry to have been Eckhart's "supervisor" to establish corporate liability.  Then, when the Court held that Henry was not Eckhart's "manager or supervisor" (a determination that is irrelevant to whether Fox News is liable under the NYCHRL) there was no need or requirement to move for reconsideration because Plaintiff survived the motion to dismiss on other grounds. In any event, "a district court's adherence to law of the case cannot insulate an issue

38

from appellate review." <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. 800, 817 (1988).

**E.**      <u>**Fox News Is Independently Liable Under § 8-107(13)(b)(2) or (3)**</u>

The district court should have applied the plain language of § 8-107(13)(b)(1) and denied summary judgment to Fox News. However, because it held that Henry needed to be, but was not, Eckhart's manager or supervisor, it wrongly concluded that Henry, the ███████ a year host/anchor, essentially worked as Eckhart's coworker and evaluated the company's liability under § 8-107(13)(b)(2) and (3). In doing so, the district court held that no reasonable jury could find that Fox News' management or supervisors knew or should have known about Henry's predilection for sexual harassment. A-536-541. As set forth below, the holding under § 8-107(13)(b)(2) and (3) is erroneous for numerous reasons that independently, and together, require reversal.

As described in detail, above, Henry engaged in sexual misconduct openly, and was notorious for doing so, long before Eckhart was raped in 2017. In fact, his behavior was so egregious that in 2016 Fox News suspended him and required him to go to treatment for a sex addiction. *Supra* at p. 12. Upon his return Fox News ██████ his compensation and promoted him, apparently without doing *anything* to monitor his behavior towards women. *Supra* at p. 15.

It is implausible that Fox News sent Henry to sex addiction therapy on the basis of a single consensual affair. And, at a minimum, a jury would be entitled to conclude that the decision to send Henry to sex rehab was because Fox News was aware that he was engaged in acts of sexual misconduct in the workplace, including, *inter alia*, that:

- Henry was engaged in workplace "sexting" that was covered up by managers at the DC Bureau before news of his affair broke.

- Henry used his Company issued device to engage in sexting. At no time was his device monitored despite Fox News' policies expressly permitting monitoring.

- Henry, who occupied a position of power at Fox News, had multiple sexual relationships with lower-level employees, including ████████████████, that latter of which was well known. Even if these relationships were arguably consensual, the power imbalance cannot be ignored and ████ has even described Henry as a "predator," who used the "power imbalance" to get her to engage in a relationship – including coercing her to engage in sex acts in Henry's office – that was "predatory," "emotionally abusive" and "not as 'consensual' as [she] thought." .

- Henry sent a picture of his penis (unsolicited) to 22-year-old production assistant, ████████ believes that she told colleagues about this sexual harassment in 2016.

- When Henry came back from suspension in 2016 "people across DC & NY [ ] reached out to ████████ expressing their discomfort and disdain" that Henry was back.

40

- Henry had not changed after graduating from "sex addict's camp" and colleagues warned that he would use his position of power to prey on women.

- In 2016 Claman told Eckhart that "everyone at Fox News knows that Ed Henry is a sex addict. That's no secret."

- ███████ who worked with Henry in the DC Bureau, said that her and others openly discussed Henry's behavior towards women and a sexual relationship he was having with ████████ in NYC.

- Henry's predilection for sexual harassment was so widely known in the industry that after this case was filed one of his prior targets tweeted: "No chance @foxnews didn't know about Ed Henry. He was a menace to many of us on the comms side when he was @cnn and everyone talked about it. Literally so so so gross."

*Supra* at pp. 12-14.

This evidence was sufficient to permit a reasonable juror to find that Fox News knew or should have known that Henry posed a risk to its female employees. *See* Melendez v. New York City Transit Authority, No. 159390/2013, 2021 WL 2627513 (N.Y. Sup. Ct. June 24, 2021), aff'd, Melendez v. New York City Transit Auth., 204 A.D.3d 542 (1st Dep't 2022) ("Melendez App. Div.").

The decision in Melendez is instructive. In Melendez, the court denied summary judgment where it was common knowledge that the alleged harasser had engaged in inappropriate sexual misconduct towards others, including, *inter alia*, "inappropriate comments" made to a colleague months prior to the plaintiff's arrival. 2021 WL 2627513, at *2; Melendez App. Div., 204 A.D.3d at 543. Like Fox News,

41

the defendant in <u>Melendez</u> claimed that no one had previously reported the misbehavior. <u>Id</u>. The court rejected the argument as misplaced because there was evidence that the conduct in question: (i) was known to dispatchers, who had some supervisory duties and "authority to request that discipline be imposed upon a bus driver;" *or* (ii) was otherwise "common knowledge at the Kingsbridge depot such that defendants 'should have known'" about it. <u>Id.</u> Here, Henry's prior sexual misconduct was known not just to mid-level employees, but to Fox News' top executives, who required Henry to attend a sex addiction program, as well as the management of the DC Bureau, which covered up a sexting incident. It was also known to "everyone," according to Claman, who is herself (as well as ███████) an anchor with significant supervisory and managerial responsibilities, including over Eckhart. And, at a very minimum, it was otherwise common knowledge at Fox News and the DC Bureau in particular that someone with supervisory responsibilities should have known about it.

The lower court disregarded all of the evidence of Henry's pre-February 2017 sexual harassment by concluding – as a matter of undisputed fact – that Fox News was not aware of any of it before Henry raped Eckhart. Even if this was a reasonable conclusion based on the facts, it is not the *only* reasonable conclusion. A jury would be entitled to find that Fox News was aware of Henry's sexually harassing behavior based on its decision to suspend and require Henry to attend sex rehab in 2016.

42

Indeed, Fox News' claim that it required Henry to attend sex rehab because of one consensual affair with a non-employee is entirely incredible. It is far more likely – and, at a minimum, a rational inference can be drawn – that the reason Fox News sent Henry to sex rehab is because it knew that he had a predilection for engaging in unwanted sexual misconduct. This inference is bolstered by the fact that Henry unquestionably *had* engaged in unwanted sexual misconduct.

The circumstances surrounding Henry's suspension further cast doubt on Fox News' claim that he was sent to sex rehab because of a single consensual affair. Henry testified that after his affair became known, he had one or two phone calls with Shine about it. CA-284. He testified that Shine told him to come to the NYC office in person. Id. Henry went to NYC and an in-person meeting was held with Shine, Wallace, Brandi and Henry. CA-284. According to Henry, after this meeting it was decided that he would be suspended for four months and travel to California to meet with a doctor to consult about the in-patient sexual rehabilitation treatment program. CA-284-286.

Not a single document exists, other than the doctor's one page letter about Henry's satisfactory completion of the sex program and a vague email from a therapist, who worked at the program, to Brandi on June 30, 2016 that confirms the inpatient sex treatment happened. More importantly, there is no logical explanation as to why decision makers Shine, Wallace and Brandi were required to address

43

Henry's behavior if it was simply about an affair by two consenting adults, much less any logical explanation as to why they decided to send him to sex rehab. Nor is there any evidence in the record that Fox News has ever suspended or required any other employee to attend sex rehabilitation for any reason, much less for having a single, non-work related, consensual affair.

No documents exist about the nature of the specific treatment program Henry was sent to, and nothing in writing exists to explain why Fox News required Henry to attend a sex rehabilitation program. The lack of any documentation for such an extreme reaction by the Company given the nature of the "wrong," coupled with the fact that HR was excluded completely from the decision-making process, creates additional doubt as to the veracity of Fox News' claim that it was unaware that Henry had engaged in employment-related sexual misconduct at the time it decided to send him to sex rehab.

In addition to all of the above, Fox News' claim that it was unaware of Henry's rampant and inappropriate sexual misconduct prior to February 2017 – a claim that the lower court accepted as undisputed fact – is based entirely on the blanket denials of interested parties (*i.e.*, Fox News' employees and executives), which the jury is entitled to disregard. Indeed, when the only evidence is testimonial at the summary judgment stage, this Court has cautioned that fact disputes based on the testimony are left to the jury. For example, after remanding back to the district court, in

44

Donoghue v. Oaktree Specialty Lending Corporation, 2024 WL 3455292, * 8

(S.D.N.Y. June 20, 2024) Judge Engelmayer held:

> When the critical evidence adduced by a summary judgment movant is testimonial, as here, an additional complication is present. As Learned Hand famously observed, "the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence" at trial, and it is "abundantly settled" that a jury should "take into consideration the whole nexus of sense impressions which they get from a witness" in determining whether to credit (or discredit) his testimony. Thus, notwithstanding that a witness has testified to a fact, a jury might not credit that testimony.

Id. (quoting Dyer v. MacDougall, 201 F.2d 265, 268 (2d Cir. 1952)).

This is the situation here. Rather than viewing the facts in a light most favorable to Eckhart, and refraining from improperly assessing credibility, the District Court accepted wholesale the testimony of interested witnesses Fox News was not aware – nor should it have been aware – of Henry's sexual misconduct. This determination was particularly improper given that a jury could easily determine that Fox News' decision to send Henry to sex rehab was based on more than just the discovery of a single consensual affair with a non-employee.[2]

---

[2] As should be very clear, Plaintiff is not contending that Fox News is liable because it was aware that Henry had engaged in an extramarital affair, or even that he engaged in consensual affairs with coworkers. That said, to the extent that the District Court determined that Fox News was required to be on notice of anything more than Henry's predilection for sexual harassment in order to be liable under § 8-107(13)(b)(2) and (3), such decision was in error. In Martin v. Nieuw Amsterdam Property Management, LLC, No. 22 Civ. 03506 (ARR) (TAM), 2025 WL 1504124, * fn. 3 [ (EDNY May 27, 2025), a case involving negligent supervision claims, the defendants argued on summary judgment that their notice that the individual defendant "had sexually harassed a

45

**F.      Fox News Is Liable for a Hostile Work Environment Because It Continued After Formal Complaints Were Made**

On summary judgment, the district court held that Eckhart's hostile environment claim came to an abrupt halt on February 10, 2017, the date Eckhart alleges Henry violently raped her. For this reason, it held that women who came forward to complain about Henry's sexual misconduct in March and April 2017 did not place Fox News on notice for purposes of 8-107(13)(b)(3). A-540 ("Other reports of misconduct by Henry came too late in time. … the report Fox News received in April 2017 …came two months after Henry and Eckhart's last sexual encounter that February.").

As stated above: (i) Fox News is liable because Henry exercised managerial or supervisory responsibilities; and (ii) Fox News knew or should have known about Henry's predilection for sexual misconduct in 2016, well before the rape on February 10, 2017. Even assuming, however, that these arguments are without merit, it was error to hold as a matter of law that Eckhart's hostile work environment ended on

single female tenant" could not place them on notice that he would sexually assault the plaintiff. Rejecting this argument, the district court reasoned that "New York law establishes that a negligent supervision claim cannot be defeated by an employer's unreasonable ignorance," and "reject[ed] the notion that only a 'prior criminal incident [or] assault' would put [the employer] on notice of the [defendant's] propensity to commit sexual assault. Id. at * 9. The court in Martin held that "[f]oreseeability is a question for a jury," and"[v]iewing the evidence in the light most favorable to [plaintiff], a reasonable jury could clearly conclude that the July 7, 2021 sexual assault was foreseeable." Id. at *9, 10 (reviewing cases). In sum, if an employer knew or should have known about any sexually harassing behavior, this is sufficient to establish liability for a subsequent sexual assault.

46

the last date Henry violently sexually assaulted her. A work environment where a harasser continues to cause harm to a victim does not cease because he fails to *physically strike* her after a date certain. Yet this is what the district court concluded, thereby ruling that regardless of what Fox News learned about Henry after February 10, 2027, a jury could never find vicarious liability.

Ample evidence shows why this decision was erroneous. Eckhart testified that after the rape, she saw Henry at the NYC office "often." CA-89, 191, 248. Eckhart testified that it was difficult to face Henry after the February 2017 rape, and when Henry would "walk towards her desk and be flirtatious," she would run and hide in the bathroom to escape him. CA-248-49. Eckhart testified that she would go out of her way to avoid Henry at the office even though it angered Henry and his anger caused her fear. A-506-507; CA-248-250. Evidence shows that Henry and Eckhart exchanged sexual texts after February 10, 2017, including in June 2017. A-174-183, A-187-88, 506-507; ECF 391 at Ex. 52. It is undisputed that Henry sent Eckhart text messages in October 2018 that she refused to respond to at the risk of angering Henry. A-178-184, 257; CA-247-48.

To rule on a summary judgment motion brought by Fox News that Eckhart could not be impacted in a harmful way by Henry's continuing to try to see her in the office and harassing her up and through these text exchanges in October 2018 is reversible error. The NYCHRL requires a totality of the circumstances review, and

47

Eckhart presented testimony that showed he continued to pursue her. Such pursuit, even if she believed he intentionally passed by her desk or pursued her via text messages, by a harasser who had violently assaulted her, cannot be held as incapable of causing a sexually harassing work environment. The district court's decision on this issue stands in contrast to its consideration of the same evidence at the motion to dismiss stage, where it held:

> In each of the three interactions that occurred in 2018, Henry sent Eckhart an unsolicited message. Eckhart alleges that unsolicited messages like the ones sent in 2018 were often the first step in Henry's "pattern" of sexual harassment, and were typically "followed by unwelcome sexual advances." Moreover, Henry sent two of these three messages immediately after he witnessed Eckhart turning or running away from him in person, and continued to send the messages even after Eckhart did not respond. In these messages, Henry alluded to Eckhart's desire not to see him, asking Eckhart "why'd you turn away today" and sending her an image of a football player in the Heisman pose (a defensive gesture in which the player extends his arm to block contact). This is reminiscent of multiple prior messages he sent her accusing her of playing "hard to get" after she declined his invitation to drinks.

Eckhart 1, at *26.

Moreover, in the motion to dismiss decision, the court reasoned that a "picture of a football player doing a defensive measure certainly takes on a different meaning when it is sent by an alleged rapist to his purported victim immediately after she "physically ran away from" him." Id. at 28. Correctly, the court held that the 2018 messages and 2014-2017 sexual harassment and assault could be part of the same hostile work environment. Id. at 28-29. At summary judgment, the district court

48

dismissed these messages from October 2018, as well as the texts in the record post February 10, 2017, including in the summer of 2017, because it said Eckhart did not "even mention" the October 2018 texts and thus "forfeited the ability to argue her hostile environment at the workplace after February 10, 2017." Id. at 42, n. 13. Respectfully, this is wrong, especially given that the record is clear that the issue was vigorously argued at the motion to dismiss stage and the continuing messages and Eckhart's re-traumatization at seeing Henry often were included and argued in connection with Henry's parallel motion for summary judgment, as well as in Eckhart's response to Fox's 56.1 Statement.

## III. THE COURT ERRED IN DISMISSING PLAINTIFF'S CLAIM UNDER THE NYSHRL

Under the NYSHRL, an employer is liable for the acts of its employees if "the employer became a party to it by encouraging, condoning, or approving it." Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 311 (3rd Dep't 2004) (quotation omitted). "'Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the [state] Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense. **An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation.**'" Eckhart 1, 2021 WL 4124616, at *19 (emphasis added).

49

In the lower court's decision on Fox News' motion to dismiss, it held that Fox News was "plausibly alleged to have condoned Henry's discrimination and harassment and may therefore be liable for it under the NYSHRL" based on the following allegations:

> Eckhart claims that "Fox News ignored the many, many red flags" surrounding Henry—namely, the above-cited allegations and rumors of sexual impropriety—and "rewarded Mr. Henry with a series of promotions," which she claims, "only emboldened him and encouraged him to escalate his mistreatment of women." Compl. ¶¶ 8–9. She further alleges that "so long as Mr. Henry was continuing to generate revenue for the Company, it was willing to look the other way and even provide him access to additional victims."

Eckhart, 2021 WL 4124616, at *19.

At the summary judgment stage, Plaintiff established that there was evidence to support each of these allegations. First, a jury could certainly determine that "'Fox News ignored the many, many red flags' surrounding Henry, including rumors of sexual impropriety." *Supra* at pp. 12-14. Second, it is undisputed that Fox News promoted Henry and rewarded him with significant compensation increases. *Supra* at p. 15. Third, the evidence established that he not only raped Eckhart following his hero's return from suspension, but also that he: (i) sexually assaulted ███████; (ii) started a power balance aided, emotionally abusive and not-so-consensual relationship with █████, who was by any definition subordinate to him in the Company; and (iii) sexually harassing Areu. *Supra* at pp. 12-14.

50

Moreover, Fox News lauds itself for terminating Henry after Eckhart retained counsel, but even by its own account the only reason it did so was because he was found to have engaged in sexual acts on company property. The fact is that Fox News intentionally stymied the investigation into Eckhart's allegations, which further demonstrates apathy and condonation. *Supra* at p. 19. Fox News' General Counsel and head employment lawyer: (i) affirmatively lied to the "independent investigator" about Henry's past; (ii) failed to disclose the various workplace affairs in which Henry had engaged, the aforementioned "sexting" incident and coverup, the discomfort that multiple women expressed regarding his presence at Fox News, etc.; (iii) denied the investigators requests to speak to witnesses with relevant knowledge, including Lord; and (iv) lied to the independent investigator by saying that those witnesses, including Lord, had no relevant information, without even consulting with the witnesses. *Supra* at pp. 18-20.

## CONCLUSION

For all the reasons set forth above, the decision granting summary judgment to Fox News should be reversed.

Dated:  September 30, 2025
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____

     Michael J. Willemin
     Jeanne M. Christensen

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
jchristensen@wigdorlaw.com

*Counsel for Plaintiff-Appellant*

52

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,735 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

Dated: September 30, 2025
    New York, New York

_____
Michael J. Willemin

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Ronnie
    Abrams, dated March 12, 2025.............................. SPA-1

Judgment, dated June 16, 2025.................................. SPA-51

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER ECKHART, <br><br>             Plaintiff, <br><br>       v. <br><br> FOX NEWS NETWORK, LLC and ED HENRY, <br> in his individual and professional capacities, <br><br>          Defendants. | No. 20-cv-5593 (RA) <br><br> <u>OPINION & ORDER</u> |

RONNIE ABRAMS, United States District Judge:

Plaintiff Jennifer Eckhart brings this action asserting claims of sexual assault, sex trafficking, revenge porn, harassment, negligence and retaliation against Fox News Network, LLC, her former employer, and Ed Henry, a former Fox News correspondent and anchor. In brief, Eckhart alleges that Henry sexually harassed and raped her and that Fox News condoned or ignored the risk that Henry would do so. She also asserts that Fox News fired her because she complained about sexual harassment, and that once this litigation began Henry filed explicit photos of her on the public docket in violation of New York's "revenge porn" law.

Defendants now move for summary judgment on each of Eckhart's claims against them. Henry argues that he cannot be liable for harassing or assaulting Eckhart because no reasonable jury could find that their sexual activity was nonconsensual. He likewise contends that no reasonable jury could find him liable for sex trafficking because it could not conclude that he "enticed" her or knew that he would use fraud or force to cause her to engage in a sex act with him as required by the law. As for the revenge porn claims, Henry asserts that several of the pictures do not depict Eckhart, and the ones that do fail to depict actionable nudity or sexual conduct within

SPA-2

the meaning of the statute. Fox News, for its part, argues that no reasonable jury could find that it should have known that Henry would assault Eckhart because it did not learn of his alleged misconduct until much later. It also contends that summary judgment should be granted on Eckhart's retaliation claims because she never complained to the network about sexual harassment before her firing, and because it had legitimate, non-pretextual reasons for terminating her in any event.

For the reasons that follow, Henry's motion for summary judgment is granted in part as to Eckhart's revenge porn claim but denied as to the remainder, while Fox News' motion for summary judgment is granted in full.

## BACKGROUND

### I.    Eckhart and Henry's Interactions

The following facts are undisputed unless otherwise noted. Eckhart began working at Fox News in January 2013, when she was hired as a freelance administrative assistant to Liz Claman, host of the *Claman Countdown* on Fox Business Network. Dkt. 388-1 ("Henry Rule 56.1 Stmt.") ¶¶ 4–6. She first came into contact with Henry—then Chief White House Correspondent at Fox News, *id.* ¶¶ 165, 175—in December 2013, when Eckhart responded to one of Henry's tweets about a popular movie, Dkt. 391 ("Quainton Decl.") Ex. 7. Two hours later, Henry sent Eckhart an email saying "haha nice tweet:)," to which Eckhart responded in part "Ha! Big fan of yours . . . . Thanks for the follow :)." *Id.* Ex. 8.

Although most of their messages were later deleted, the ones remaining sketch an outline of the course of their relationship. Sometime in 2014, Henry sent Eckhart a private message saying "beautiful." Henry Rule 56.1 Stmt. ¶ 12. Eckhart responded by telling Henry that she was a fan of his and that it would be an honor to meet him. *Id.* Henry then told Eckhart that he was in New

SPA-3

York and invited her to meet him in the green room to take a picture, which she did. *Id.* ¶¶ 13–14. Henry contacted Eckhart again in June 2014, when he sent an email to her work account asking "this you?  :)." *Id.* ¶ 15; Quainton Decl. Ex. 9.  Eckhart responded "Maybe :)," to which Henry said "hard to get."  Quainton Decl. Ex. 9.  Eckhart replied "Very hard" and, after another back-and-forth, told Henry to "[t]ry" her on her personal email address. *Id.*

Henry later invited Eckhart to begin messaging on the messaging service WhatsApp. Henry Rule 56.1 Stmt. ¶ 16; Quainton Decl. Ex. 10.  According to Eckhart, Henry then started to "incessantly bl[o]w up [her] phone" with messages "demanding that she meet him for a quick drink."  Dkt. 433 ("Eckhart Rule 56.1 Stmt. to Henry") ¶ 186 (alterations omitted).  He also sent her sexually explicit text messages, including one that stated "I bet you're really good in bed" and others inquiring about her favorite sexual positions. *Id.* ¶ 187.  Eckhart says that Henry also sent her unsolicited pornographic images and videos which depicted "women getting slapped" and "abused." *Id.* ¶¶ 187, 189 (alterations omitted).

Although Eckhart responded to many of these messages, she maintains that she did so out of pressure.  In her words, she was a "young girl" who had "just start[ed] her journalism career" and could not afford "to tell the [C]hief White House Correspondent that she was uncomfortable with the material he was sending her." *Id.* ¶ 190 (alterations omitted).

Eckhart eventually agreed to meet Henry for a drink later in 2014 at the Marriott Marquis hotel in New York City.  Eckhart Rule 56.1 Stmt. to Henry ¶¶ 19–20.  The parties vigorously dispute the events of that evening.  Henry says that he invited Eckhart to his room, where the two had consensual oral and vaginal sex.  Henry Rule 56.1 Stmt. ¶¶ 20–21.  He also recalls that Eckhart texted him afterwards that she wanted "more of it." *Id.* ¶ 26.

3

SPA-4

While Eckhart agrees that the two had sex, she insists it was not consensual. Eckhart Rule 56.1 Stmt. to Henry ¶¶ 19–21. In her telling, she did not feel that she could say no to Henry's invitation to get drinks. *Id.* ¶ 192. She did, however, hope that she could use the opportunity to get career advice, and brought a legal pad with career-related questions about Henry's work and career progression. *Id.* ¶ 193. After she asked him several questions on those topics at the hotel bar, Henry invited her to his room for another drink, and allegedly said that he wanted to discuss her career further. *Id.* ¶ 195. Eckhart again "felt like she could not say no" and acquiesced. *Id.* ¶ 196. But when they got to his room, Henry locked the door and started "forcefully" kissing her. *Id.* ¶ 197. According to Eckhart, he then threw her against a wall, undressed her, threw himself on top of her on the bed and had sex with her. *Id.* Although Eckhart admits she did not say "no" or fight Henry off, she maintains that she entered a state of shock, and was afraid of what he would do if she protested. *Id.* ¶¶ 199–200. Once they finished, Eckhart says that Henry told her that she was beautiful and should become an on-camera star. *Id.* ¶ 201. He further stated that he could put her in the room with powerful decisionmakers at Fox News. *Id.*

Their next physical interaction occurred the following year, on September 26, 2015. *Id.* ¶ 202. Henry was again in the New York office and sent Eckhart a message demanding that she remove her underwear and put them in an envelope for him. *Id.* ¶ 203. She complied with Henry's request, she says, because she feared professional consequences otherwise. *Id.* ¶ 204. Henry retrieved the envelope with her underwear and then texted her to come see him in a guest office in the building. *Id.* ¶ 205.

Eckhart went to that office as requested, where she performed oral sex on him. *Id.* ¶ 31. Eckhart again disputes that this incident was consensual. *Id.* By her account, she only went to Henry's guest office out of fear of retaliation, and tried to leave immediately by telling him she

4

was very busy. *Id.* ¶ 207. Henry allegedly closed the door and began forcibly kissing her before pinning her against a wall. Eckhart says he then grabbed her head and forced her to give him oral sex. *Id.*

The two exchanged sexually explicit messages over the next few months. In October 2015, for instance, Eckhart emailed Henry that she had a "top secret server" from which she "had wiped all the dirty pictures with a cloth"—an apparent reference to the recent news story about Hilary Clinton wiping her server. *Id.* ¶ 39; Quainton Decl. Exs. 9, 12. Henry replied "I'd like to wipe you with my tongue," to which Eckhart responded "I bet you would, dirty boy. Come n get it." Eckhart Rule 56.1 Stmt. to Henry ¶ 40–41; Quainton Decl. Ex. 12. A few months later, in January 2016, Eckhart sent Henry a playlist of songs with sexual titles, including "Cockiness (Love it When You Eat It)" and "F*ck You All the Time." Eckhart Rule 56.1 Stmt. to Henry ¶¶ 42–44; Quainton Decl. Exs. 14–18. Although Henry says she sent these messages to invite sexual contact, Eckhart maintains that she did so "under threat" because she was "in fear" of losing her job. Dkt. 430 ("Willemin Decl. to Henry") Ex. 3 at 476 (Eckhart Deposition).

Later that year, in May 2016, a story broke that Henry had been having "an extramarital affair with a stripper in Las Vegas." Eckhart Rule 56.1 Stmt. to Henry ¶ 168. Fox News suspended him for four months so he could complete a sex rehabilitation program. *Id.* ¶¶ 171–72. Soon after Henry returned to work, in early February 2017, Eckhart sent Henry a series of erotic pictures, purportedly of herself. *Id.* ¶ 47. Most of the photos depicted Eckhart in lingerie or partially nude. The others were pictures of scantily clad or nude women (with their faces obscured) that Eckhart had found online. *Id.*; Willemin Decl. to Henry Ex. 3 at 533 (Eckhart Deposition). Eckhart and Henry sent each other sexually explicit messages around the same time, many of which discussed rough and violent sexual acts. In one exchange, Eckhart sent Henry a picture of a belt; Henry said

she was playing "hard to get" to which Eckhart responded "Not true.  Always obey and make myself avail to u" with a red lips emoji.  Henry replied "#obey [o]r #discipline."  Eckhart Rule 56.1 Stmt. to Henry¶¶ 49–50; Quainton Decl. Ex. 27.

Days later, the two had another explicit exchange and discussed meeting up that Friday, February 10, 2017.  At one point, Eckhart told Henry in graphic detail that he "need[ed]" her, and Henry responded that she was going to "get tossed around like a lil rag doll."  Eckhart Rule 56.1 Stmt. to Henry ¶ 51; Quainton Decl. Ex. 28.  Eckhart replied simply by saying "Love that."  *Id.* Eckhart affirms that she sent these messages, though she maintains that she "was not being flirtatious."  Quainton Decl. Ex. 2 at 508 (Eckhart Deposition).  She testified that she "was scared that if [she] didn't tell him what he wanted to hear, [she] would get punished both physically and professionally."  *Id.*  That fear was particularly intense, in her view, because Henry "had already sexually assaulted [her]" and "caused her great bodily harm."  *Id.*

Eckhart claims that on Friday, February 10, 2017, Henry raped her.  The day's events are fiercely disputed.  According to Henry, Eckhart sent him a picture that morning of a woman's bottom wearing only "thong-like underwear."  Henry Rule 56.1 Stmt. ¶ 52; Quainton Decl. Ex. 26.  Henry, who was in town to anchor *Fox & Friends*, then asked her to get a drink at a Midtown restaurant.  Henry Rule 56.1 Stmt. ¶ 52.  After a quick drink, the two went to Henry's nearby hotel, where he says they had consensual—albeit rough—sex.  *Id.* ¶ 53.  Henry acknowledges that they engaged in "extreme" sexual practices, including using "handcuffs" as well as "a belt with which [Henry] struck [Eckhart] on the back," but insists that they did so willingly.  *Id.*

In sharp contrast, Eckhart says she was violently raped and beaten.  By her telling, she sent Henry the intimate picture that morning—which in truth was a picture of another woman she had found online—"because he just asked to see a picture of [her] ass."  Willemin Decl. to Henry Ex.

3 at 533–34 (Eckhart Deposition). She also maintains that Henry invited her over not for sex but "for a quick drink and to discuss [her] career," *id.* at 503, and says she acquiesced only because she was afraid of him and feared retaliation, Eckhart Rule 56.1 Stmt. to Henry ¶ 214. When she arrived at the restaurant, Henry allegedly announced that Fox News was giving him his very own show, and he said he wanted to bring her on as a guest. *Id.* ¶¶ 216–18. Eckhart says this news caused "a wave of fear" to come over her, as it meant Henry would be "more emboldened" and "empowered." Willemin Decl. to Henry Ex. 3 at 535 (Eckhart Deposition). Henry also asked her how her job was going and whether she had an agent, after which he offered to introduce her to his high-profile agent. *Id.* at 549. After one drink, Henry asked if she wanted to discuss his promotion and her career at his hotel; he allegedly assured her they would only be going for drinks. Eckhart Rule 56.1 Stmt. to Henry ¶ 223. Because Eckhart "genuinely wanted to discuss [her] career" and "on-air aspirations," she agreed to go to his hotel. Willemin Decl. to Henry Ex. 3 at 536 (Eckhart Deposition).

As soon as they left the restaurant, however, Henry began to "forcefully" pull her, which caused her to panic. *Id.* She tried to come up with an excuse that her high heels were hurting her but Henry, undeterred, "forced [her] over to his hotel" down the street. *Id.* As Eckhart testified, as soon as they entered his room, Henry immediately "forced himself" on her. *Id.* at 537. He "ripped" off her dress and coat and "pinned" her against a wall. He then placed metal handcuffs on her wrists and threw her on the bed. *Id.* Henry proceeded to take pictures of her naked on the bed, without her consent, which he later sent to a group chat of friends. *Id.* Ex. 65. She asked him to delete the photos and remove the handcuffs but he simply "laughed at [her]" and remarked that "it helps when you've got friends with the NYPD." *Id.* Ex. 3 at 537–38 (Eckhart Deposition). Eckhart interpreted this as a threat to not go to the police. *Id.* at 538.

7

Henry allegedly hit her "violently" in the face multiple times, before taking off his belt and whipping her several more. *Id.* at 538–39. She asked him to stop, but he ignored her. *Id.* at 539. Henry then "forcefully rape[d] her." *Id.* at 539–40. When it was over, her wrists and lip were bleeding, and she had whip marks all over her body. She quickly got dressed and declined Henry's offer to get her an Uber. Eckhart then ran out of the hotel lobby without shoes and flagged down a cab, which took her home. *See id.* at 540. Henry disputes this account and insists the sex was entirely consensual.

In the days following the alleged rape, Eckhart and Henry continued to exchange sexual messages, including some that referenced the handcuffs and rough sex. Eckhart Rule 56.1 Stmt. to Henry ¶¶ 76–79 (Eckhart texting "You put all your friends in cuffs?" and mentioning "sore wrists, marks on [her] ass, broke a nail, bruise on [her] leg"); *id.* ¶ 81–82 (Eckhart texting "You didn't get enough" and "F*cking dirty boy. I love it."); *id.* ¶ 83 (Henry texting "F*ck you and your safe word"); *id.* ¶ 88–89 (Eckhart texting "Want it. Badly.").

The two engaged in more sexually charged conversation over the next several months. *Id.* ¶¶ 89–104; Quainton Decl. Ex. 49. At one point, Henry and Eckhart discussed who was in the dominant position in their relationship, with Eckhart saying "I thought I was in charge" and Henry confirming "[y]ou are." Eckhart Rule 56.1 Stmt. to Henry ¶ 120; Quainton Decl. Ex. 54. In these exchanges, Henry often used violent and aggressive language, such as "when u r owned U don't get a 'Choice,'" Eckhart Rule 56.1 Stmt. to Henry ¶ 238, "You didn't get enough . . . Bruised battered begging for more," *id.* ¶ 81, and "You needed to take your punishment," *id.* ¶ 239.

Henry also asserts that Eckhart continued to send him sexually explicit photos, including several in the weeks right after the alleged rape. Henry Rule 56.1 Stmt. ¶¶ 68–72. Ten of these fifteen photos depicted her in underwear or partially nude and the remaining five were photos

Eckhart had found online of other women who were partially unclothed or naked. *Id.* Eckhart admits that she sent the photos but asserts that she did so before the alleged rape on February 10. *Id.*[1]

Despite their explicit messaging, the parties did not have any sexual contact following the alleged rape. *Id.* ¶ 123.[2] They did, however, see each other frequently in the office. *Id.* ¶ 240. Henry also shared some of the explicit photos of Eckhart with a group chat, Willemin Decl. to Henry Ex. 63, calling Eckhart a "whore" and saying that she "took the belt," *id.* Ex. 64.

A few months after the February 2017 incident, Eckhart deleted some—but not all—of her communications with Henry. Eckhart Rule 56.1 Stmt. to Henry ¶¶ 131, 245. She explained at her deposition that seeing reminders of Henry and the rape was traumatizing. *Id.* She did, however, preserve some of their exchanges by taking screenshots on her phone, which are part of the record in this case. *Id.* ¶¶ 132, 135, 246. Henry also deleted their conversations that same year, claiming he wanted to hide his infidelity from his wife. *Id.* ¶ 244.

## II.    Eckhart's Employment at and Termination from Fox News

Eckhart worked at Fox News from 2013 until her termination in 2020. Dkt. 376 ("Fox Rule 56.1 Stmt.") ¶¶ 3, 9. She was initially hired as an administrative assistant on the *Claman Countdown* but received several promotions to production assistant, researcher/booker and finally associate producer. *Id.* ¶¶ 3–8.

---

[1] Although the photos depict time stamps after the alleged rape, Eckhart maintains that those dates could refer to "when they were uploaded" or "edited" as opposed to "sent." Willemin Decl. to Henry Ex. 3 at 636 (Eckhart Deposition).

[2] At Eckhart's deposition, Henry's counsel asked whether she had another sexual encounter with Henry on June 19, 2017, a date on which the parties exchanged several explicit messages. Willemin Decl. to Henry Ex. 3 at 601–02 (Eckhart Deposition). Eckhart denied that they met that day, *id.*, and Henry does not assert otherwise in his Rule 56.1 Statement.

The parties dispute Eckhart's performance in these roles. Eckhart characterizes her performance as "good" and cites various instances of praise she received from superiors over the years. Dkt. 413 ("Eckhart Opp. to Fox") at 18. In 2014 and 2015, for instance, Claman told her she was "the kindest and best," said she "need[ed] to see [Eckhart] promoted and kept on [her] show" and called her a "rockstar." Dkt. 424 ("Eckhart Rule 56.1 Stmt. to Fox") ¶¶ 522–23, 546. Senior Vice President Thomas Bowman also called her a "star," and her direct supervisor Brad Hirst thanked her for her "hard work and dedication," saying she "played a major role" in the show's recent success in the ratings. *Id.* ¶¶ 524–26. In 2017, Hirst also said Eckhart "may be the best news writer on the team" and was "an invaluable part" of it. *Id.* ¶ 527.

Her 2018 performance review was particularly strong. She received a rating of 4 out of 5 and was labeled "one of the most talented/booker/researchers at the network." *Id.* ¶ 358. The review also called her "invaluable," "instrumental," "an excellent employee" and "one of the most dependable members of the staff." *Id.* Her 2019 review was also had positive aspects, saying she was "one of the most editorially sound members of [the] staff," "an excellent writer and researcher" and always prepared in advance of any field shoots. *Id.* ¶ 359. She continued to receive direct praise from supervisors in 2019 and early 2020, including messages from Claman saying "Thank you for that 'special something' you always add to your segments and for being so great! Thanks for all your hard work" and "Highest rated segment was yours on Peloton!!" and another from Hirst saying "Thank you for making my life easier each day!" *Id.* ¶¶ 528–30.

Although Fox does not dispute that Eckhart received this praise, it paints Eckhart's performance in a much different light. As Eckhart admits, she was consistently late for work, and her supervisors regularly flagged her tardiness as a performance issue. In 2017, she was late or absent sixteen times and had to ask a co-worker to perform some of her morning duties for the

*Claman Countdown*. Fox Rule 56.1 Stmt. ¶ 20. In the first two-and-a-half months of 2018, she was late or absent another fifteen times and again had to ask co-workers to cover for her. *Id.* ¶ 28. During her mid-year review in March 2018, Hirst flagged her "consistent tardiness" as an issue, and later said that her "lateness would not be tolerated and could lead to disciplinary action." *Id.* ¶¶ 29–32.

Despite that warning, Eckhart was late at least thirty-three more times in 2018 and repeatedly asked her co-worker to handle her duties in her absence. *Id.* ¶ 33. Although Eckhart was promoted to associate producer in August 2018, *id.* ¶ 8, Hirst continued to warn her about her lateness, including at her mid-year review in January 2019, *id.* ¶ 35. That did not rectify the issue, as she was late or absent at least nineteen times from the beginning of 2019 through early July 2019. *Id.* ¶ 37.

Largely due to her tardiness, Eckhart received a low rating in her 2019 review, a 2 out of 5 score meaning "Below Expectations." *Id.* ¶¶ 40–42. Although the review had some positive statements about her performance, as noted just above, much of it was negative. Hirst wrote that "[Eckhart] seems to have great challenges arriving to work on time" and was "often late multiple days per week." *Id.* ¶ 43. He continued that he had warned her repeatedly about this issue, but Eckhart "ha[d] a different excuse every day . . . . The lateness and sick calls are morale killers and can[]not continue." *Id.* He also gave Eckhart a "final warning" that "the next lateness w[ould] lead to disciplinary action." *Id.* Eckhart continued to be late nonetheless. *Id.* ¶¶ 44, 46. After she told Hirst that she would be late one day in September 2019, he told her that "lateness is unacceptable" and that "any further infractions will be reported directly to Human Resources for disciplinary action." *Id.* ¶ 45.

Eckhart reportedly committed other infractions around this time.  In September 2019, Fox News tested out a new and proprietary graphics package before its planned release, and video footage was taken of Eckhart sitting as a mock "anchor" on set. *Id.* ¶¶ 47–48.  Eckhart then posted photos of the footage on Instagram, which prematurely revealed the new graphics package.  *Id.* ¶¶ 49–50.  Hirst immediately told Eckhart to take the pictures down and warned her that she had revealed the network's proprietary information. *Id.* ¶¶ 51–54.

At another point in 2019, Fox News' Media Relations department sent a complaint to Denise Collins, senior vice president of Human Resources ("HR"), after Eckhart appeared on material promoting an outside event. *Id.* ¶¶ 55–56.  The materials listed her as a "representative" of Fox News and identified her position as something other than her "actual title" at the network. *Id.* ¶ 58.  The complaint said that Eckhart had violated company policy by failing to preclear her appearance and using the wrong title. *Id.* ¶ 60.

Eckhart was then late at least sixteen more times between September 2019 and mid-January 2020. *Id.* ¶ 61.  In January, her supervisors exchanged several emails stating their displeasure with Eckhart's lateness.[3]  A senior producer on the *Claman Countdown* emailed Hirst that "there's a point at which I can't do [Eckhart's] work for her.  It's becoming a daily thing." *Id.* ¶ 62.  She again complained several weeks later that Eckhart's "demeanor and work ethic weighs on the team as a whole, has been noticed by Liz [Claman] and interferes with you and me most in particular because we are [the] ones left constantly to . . . actually do the work she refuses to do." *Id.* ¶ 63. Claman also told Hirst that she believed Eckhart was prioritizing her personal ambition of becoming an on-air journalist over her current role as producer. *Id.* ¶ 64.  In early February 2020,

---

[3] Eckhart objects to these emails as inadmissible hearsay.  That objection is overruled, because the emails are being offered not for their truth but to "show the state of mind of Defendant's representatives in making various employment decisions with regard to Plaintiff." *Kaur v. N.Y.C. Health & Hosps. Corp*, 688 F. Supp. 2d 317, 323 (S.D.N.Y. 2010) ("[T]he truth of the assertions in the documents is irrelevant.").

Hirst and two other supervisors met and discussed placing Eckhart on a Performance Improvement Plan ("PIP"). *Id.* ¶¶ 67–73.

Fox News then learned on February 7, 2020 that Eckhart had arranged "red carpet" access for her and a Fox News cameraman to shoot footage of her interviewing celebrities at a charity event. *Id.* ¶¶ 74–76. She then had an editor at Fox News edit the footage and charged the cost of the camera and editing work to the *Countdown* budget. *Id.* ¶¶ 74, 78, 81. According to Fox News, this was "misappropriation" of company resources, as Eckhart never received approval for this event by clearing it with Hirst. *Id.* ¶ 80. Eckhart claims that she told Claman about the event in advance, Dkt. 427 ("Willemin Decl. to Fox") Ex. 5 at 138 (Eckhart Deposition), although Fox News maintains that only Hirst had authority to approve the expenditure, Dkt. 458 ("Fox Rule 56.1 Reply") ¶ 79.

Hirst and Collins then met with Eckhart on February 10, 2020 to discuss her recent performance issues. Eckhart Rule 56.1 Stmt. to Fox ¶ 90. Hirst told Eckhart that she had broken protocol when she attended the charity event and informed her that they were thinking about putting her on a PIP. *Id.* ¶ 91. After Eckhart learned about the potential PIP, she told them that she was working in a "toxic environment" and complained of frequent screaming and cursing as well as incidents where she was "ganged up on" by jealous "mean girls" on the staff and otherwise bullied. *Id.* ¶¶ 92–93. Eckhart identified by name several colleagues—all female—who had contributed to this perceived hostility. *Id.* ¶ 93.

The parties dispute whether Eckhart's "toxic environment" statement was a complaint about sexual harassment. Eckhart concedes that she never mentioned "sexual harassment" by name during the meeting, and identified only female employees as the source of the toxic environment. *Id.* ¶¶ 93–95. Her notes memorializing the meeting after the fact include the

13

SPA-14

following reflection:  "In addition to the emotional and verbal abuse that goes on, I have not yet mentioned the sexual harassment that goes on at every level in this building that I've experienced first-hand on office property."  *Id.* ¶ 96.  She further wrote that "I plan to follow-up with Human Resources on the status of this situation, but still remain frightened to come forward with my sexual harassment claims."  *Id.* ¶ 363.

Hirst and Collins began to develop Eckhart's PIP in the month after the meeting.  *Id.* ¶ 99.  During that period, Hirst told Collins that Eckhart had continued to be late and absent and stated that their "discussion clearly didn't have a major impact on her attitude."  Dkt. 370 ("McKenna Decl.") Ex. 13 at 4.[4]  They formally placed Eckhart on a PIP on March 6, 2020.  Eckhart Rule 56.1 Stmt. to Fox ¶ 101.  The PIP listed several "Deliverables" for Eckhart, including arriving to work by 8:45 a.m., completing her morning tasks, meeting her other deadlines and requesting approval in advance for vacation and appointments that would cause her to miss work.  McKenna Decl. Ex. 47.  The PIP also informed Eckhart that she was not currently meeting expectations and needed to "immediately improve" her performance.  *Id.* at 2.  It further warned her that failure to meet the PIP's requirements could result in "further performance management or disciplinary action, up to and including the immediate termination of [her] employment."  *Id.* at 4.  According to Eckhart, however, Hirst also assured her that the PIP was nothing to worry about and would only last a month.  Eckhart Rule 56.1 Stmt. to Fox ¶ 370.

In Fox News' view, Eckhart's performance did not improve.  According to weekly reports that Hirst received, Eckhart regularly failed to complete her morning tasks, did not respond to important emails, was unprepared during meetings and prepared sloppy and under-researched

---

[4] While Eckhart is correct that this email cannot be used for the truth of the matter asserted—that Eckhart was late—it can be used to show Hirst's motivations for proceeding with the PIP.  *See Kaur*, 688 F. Supp. 2d at 323.

14

pitches for segments. *Id.* ¶¶ 110–17.[5] She also created graphics with multiple errors and made other mistakes that disrupted the show, such as failing to edit a soundbite and booking the wrong guest. *Id.* These summaries further detailed how Claman requested that Eckhart be taken off production duties for any high-profile guests due to her mistakes, and how Eckhart was reassigned to a segment viewed as the "easiest" one on the show. *Id.*

Her final performance summaries came in May and June 2020, which characterized her as being "unprepared," putting in the "most bare minimum effort" and having "failed to correct patterns of behavior and actions that were outlined in her PIP." *Id.* ¶ 115. They also stated that she "continue[d] to cause extra work for those around her due to her lack of preparedness" and noted that she was "[w]ell past her 60-day probation period" during which she had to improve under the PIP. *Id.* ¶ 117. Her last weekly summaries said things were "not getting better" and were in fact "getting worse." *Id.* ¶ 118. By June 4, 2020, Hirst concluded that Eckhart "had not lived up to" her PIP. *Id.* ¶ 119.

Finally, on June 10, 2020, Hirst emailed Collins about an incident in which Eckhart had botched a segment. *Id.* ¶ 120. According to Hirst, Claman had told her "word-for-word" what the segment should be, but Eckhart failed to include any of that information in her script. She instead "lifted" text verbatim from the guest's market notes, which Hirst believed to be completely unacceptable. *Id.* Eckhart denies that she lifted any material and maintains that Hirst told her the segment was "great." Willemin Decl. to Fox Ex. 5 at 215 (Eckhart Deposition).

Hirst then decided to terminate Eckhart. On June 12, 2020, Hirst and Collins fired her in an in-person meeting. Eckhart Rule 56.1 Stmt. to Fox ¶ 123. Hirst told her that she was being

---

[5] As above, these summaries are admissible to "show the state of mind of Defendant's representatives in making various employment decisions with regard to Plaintiff." *Kaur*, 688 F. Supp. 2d at 323,

terminated due to her tardiness, failure to comply with the PIP, premature public disclosure of the proprietary graphics package and misappropriation of company resources in connection with the charity event. *Id.* ¶ 124. Eckhart disputes those motivations and maintains that she was fired for complaining about sexual harassment during the February 10, 2020 meeting. *Id.* ¶ 122. After Eckhart was told of her termination, she read from a script she had brought to the meeting that referred to "the emotional, verbal and the sexual harassment that goes on at every level in this building." *Id.* ¶ 125–26. Collins then asked her if she had been sexually harassed or assaulted, but Eckhart did not answer. *Id.* ¶¶ 128–29.

Two weeks later, Eckhart's counsel contacted Fox News and informed it that Henry had engaged in inappropriate sexual conduct. *Id.* ¶ 151. Fox News hired a law firm to investigate those allegations the same day. *Id.* ¶ 152. The firm interviewed Henry later that afternoon and asked about the three sexual encounters he had with Eckhart. *Id.* ¶ 154. Henry admitted that these incidents had occurred but insisted they were consensual. *Id.* ¶ 155. Although the firm also asked to speak with Eckhart and see her communications with Henry, she declined. *Id.* ¶¶ 161–63.

On June 30, 2020, the law firm provided a written report of its preliminary findings to Fox News. *Id.* ¶ 168. The report concluded that Eckhart and Henry had engaged in numerous communications between 2014 to 2017 and had engaged in three sexual encounters, including the September 2015 incident in which Eckhart performed oral sex on Henry in the Fox News office. *Id.* ¶ 170. Jay Wallace, the president of Fox News, and Kevin Lord, the executive vice president of HR, then reviewed the report and concluded that Henry would be terminated for engaging in sexual activity on Fox News premises. *Id.* ¶¶ 172–73. Henry was terminated on July 1, 2020. *Id.* ¶ 174.

### III.    Henry's Other Affairs and Allegations

According to Eckhart, Henry engaged in other sexual misconduct while employed at Fox News. In May 2016, the network learned that Henry had been having a consensual, extramarital affair with a stripper in Las Vegas. *Id.* ¶ 12. The network suspended Henry, took him off the air for four months, reduced his annual compensation by thirty to forty percent and removed him as Chief White House Correspondent. *Id.* ¶ 13.

During his suspension, Henry attended a treatment program with a doctor and a therapist. *Id.* ¶ 14. Eckhart asserts that this was a "sex rehabilitation program" to treat sex addiction, and that Fox News required Henry to attend it. *Id.* ¶ 401. Fox News insists that it merely "suggest[ed]" he attend the program, Dkt. 375 ("Fox News Br.") at 16, and disputes that it was a "sex rehabilitation program," Fox Rule 56.1 Reply ¶ 401. Kevin Lord, the executive vice president of HR at Fox News, however, similarly described the program as a "sexual rehabilitation center." Willemin Decl. to Henry Ex. 8 at 70 (Lord Deposition).

Henry returned to work in September 2016 after his treating doctor advised Fox News that he had successfully completed the program. Eckhart Rule 56.1 Stmt. to Fox ¶ 15. Despite the suspension, Fox News gave Henry a raise at the start of 2017, increasing his salary to a level around forty percent higher than his pre-suspension pay. *Id.* ¶ 403. It later gave him another sizable raise and further increased his responsibilities, making him a weekend host of *Fox and Friends* and an anchor on *America's Newsroom*. *Id.* ¶ 405.

Soon after Henry returned from his suspension, in November 2016, he began a sexual relationship with an entry-level employee (identified as "Jane Doe 1" in Eckhart's complaint) at Fox News. Eckhart Rule 56.1 Stmt. to Henry ¶ 250; Fox Rule 56.1 Reply ¶ 269. According to the woman's declaration, Henry sent her an unsolicited picture of his penis before they became

involved. Eckhart Rule 56.1 Stmt. to Henry ¶ 251. Once they began their affair, he at one point hit her so hard she began to cry. *Id.* ¶ 251. Although the woman described Henry as "emotionally abusive," McKenna Decl. Ex. 114 ¶ 12, she nonetheless stated that she did not "feel forced or coerced into doing anything [she] did not want to do" at any point "during [her] relationship with [him]," *id.* ¶ 6.[6] Henry admits that this affair happened and that the two engaged in "S & M," or "sadistic and masochistic" sex. Willemin Decl. to Henry Ex. 5 at 42 (Henry Deposition). Although Eckhart suspects that Jane Doe 1 told someone else at Fox News about the affair, the woman maintains that she never reported her relationship to HR. McKenna Decl. Ex. 114 ¶¶ 13–14. According to Fox News, Jane Doe 1 never told anyone at the network about her relationship with Henry until after Eckhart filed this lawsuit. *See* Fox Rule 56.1 Stmt. ¶ 273.

In another incident, Henry and another Fox News employee ("Jane Doe 2" in the complaint) developed a "mutually flirtatious banter relationship" that never evolved into anything "physical or romantic." Fox Rule 56.1 Reply ¶ 290. The two primarily exchanged emails and texts as well as "flirtatious pictures" over the messaging app Snapchat. *Id.* ¶ 291. At one point, Henry sent the woman an unsolicited picture of his penis over the app. *Id.* ¶ 292; *see also* McKenna Decl. Ex. 116 ¶ 8 ("I was shocked and upset when I saw the photo, and threw my phone aside"). Although the woman stated that she "likely first told people at Fox News about the incident in the 2016 time frame," she acknowledged that she did not have a "specific recollection of any such conversation(s)." Fox Rule 56.1 Reply ¶ 293 (quoting McKenna Decl. Ex. 116 ¶ 11).

---

[6] Although the woman sent Eckhart several text messages saying that she was "victimized" and that Henry was a "predator" who relied on a "power imbalance," Eckhart Rule 56.1 Stmt. to Fox ¶ 272, in her declaration she explained that although she regretted her decision to enter into a relationship with Henry, that relationship "was at all times welcome and consensual irrespective of what [she] said in [her] text exchanges with [Eckhart]," McKenna Decl. Ex. 114 ¶ 12. In any event, those messages are unsworn hearsay and Eckhart does not argue that they are admissible under any of the exceptions to the hearsay rules. *See Patterson v. County of Oneida*, 375 F.3d 206, 222 (2d Cir. 2004) (refusing to consider out-of-court statements that were not "reaffirmed in an affidavit" or otherwise admissible under a hearsay exception).

SPA-19

Another woman ("Jane Doe 4" in the complaint) alleges that Henry began sending her sexually explicit messages in 2012, before she worked at Fox News. Fox Rule 56.1 Stmt. ¶¶ 277–78. She initially responded to Henry "politely" to "maintain professional ties given his status in the industry." Willemin Decl. to Fox Ex. 13 ¶ 3. In 2013 or 2014, she says that Henry entered a hotel room in which she was staying, "immediately launched" himself at her and began kissing her before she objected. *Id.* ¶ 4. After she joined Fox News, Henry told her that he had a hand in getting her a role at Fox News, *see id.* ¶ 8, and two months later tried to kiss her again "without her consent," *id.* ¶ 9. The woman eventually left Fox News in June 2018 and held a going away party with her colleagues that Henry attended. *Id.* ¶ 11. According to the woman, Henry sexually assaulted her at the party by "suddenly and very unexpectedly put[ting] his hand under the table and under [her] skirt and finger[ing] her . . . without [her] consent." *Id.* She never told anyone at Fox News about these incidents. Fox Rule 56.1 Reply ¶ 283.

Henry also had affairs with other women at the network.[7] He admitted in his deposition to having a consensual affair with a producer around 2015, although he did not believe that anyone at the network learned about their relationship. Fox Rule 56.1 Reply ¶¶ 294–97. In April 2017, another producer at the network informed Wallace and Lord that she too had had a consensual affair with Henry around 2014 to 2016. *Id.* ¶ 186–87. She also told Wallace and Lord of various other rumors she had heard about Henry's affairs, including a "sexting relationship" with a woman at another network, another sexting relationship that Fox News had allegedly helped Henry "cover

---

[7] Eckhart further asserts that Henry had an affair with a non-Fox employee, Roxie Marroquin, in which Henry pressured her into unwanted sexual contact. Eckhart Rule 56.1 Stmt. to Fox ¶¶ 382–95. Eckhart's only source for this allegation is a news article, however, which is "inadmissible hearsay." *Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 362 n.11 (S.D.N.Y. 2014) (internal quotation marks omitted). The same is true of other out-of-court statements and messages referenced in Eckhart's papers, *see, e.g.*, Eckhart Rule 56.1 Stmt. to Fox ¶ 398 (Tweet by Brooke Hammerling), which were not "reaffirmed in an affidavit" and thus cannot be used to oppose summary judgment, *Patterson*, 375 F.3d at 222.

up" and an affair he had with a desk assistant. *Id.* ¶ 191. The woman added that she did not think Henry should be promoted to an anchor role in which he "could prey on women." *Id.* She did not allege, however, that any of Henry's behavior was unwelcome or nonconsensual. *Id.* ¶ 193.

These allegations prompted Lord to look into the rumors about Henry. *Id.* ¶ 194. He interviewed the individual who was the apparent source of the rumor that Henry was sexting a woman at another news organization. *Id.* ¶ 195. He also called the head of that other network, who told Lord that he was not aware of the sexting relationship. *Id.* ¶ 196. Lord said he asked others to explore the "cover up" and desk assistant rumors but was not able to determine whether these incidents had occurred. *Id.* ¶¶ 198–99. Eckhart admits that Lord called the head of the other network but disputes that Lord actually sent subordinates to investigate the other rumors. *Id.* According to Fox News, it did not confirm that any of these other affairs occurred until 2020, after Eckhart filed this suit. *See* Fox News Br. at 18.

## IV.    Eckhart's Lawsuit and Revenge Porn Allegations

Eckhart filed her original complaint on July 20, 2020, which she has since amended several times. Dkt. 1. On October 19, 2020, Henry filed a motion to dismiss her second amended complaint accompanied by a series of sexually explicit photographs that Eckhart had sent him. Dkt. 85 Exs. G–U. Several of the photos were redacted in part to obscure nudity but were otherwise available on the public docket. *Id.* A month later, Eckhart filed a third amended complaint adding a new claim that Henry had violated New York's "revenge porn" law by filing the images. Dkt. 113.

Henry and Fox News moved to dismiss Eckhart's third amended complaint, Dkt. 117, which the Court granted in part and denied in part, Dkt. 157. Eckhart subsequently filed a fourth amended complaint in December 2022, which is the operative complaint. Dkt. 227. The parties

then completed discovery, after which Henry and Fox News filed the instant motions for summary judgment in September and October of 2024.

## LEGAL STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit'" and genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a material dispute exists, courts must "resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (internal quotation marks omitted). "Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1012 (2d Cir. 1996). To that end, "[s]ummary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). "[E]vidence of the non-movant is to be believed," *id.* (quoting *Anderson*, 477 U.S. at 255), and the moving party bears the burden of showing that, despite that evidence against it, a reasonable jury would have to find in its favor, *see Anderson*, 477 U.S. at 256.

## DISCUSSION

### I.   Gender-Motivated Violence, Assault and Battery

Henry first moves for summary judgment on Eckhart's state-law claims of assault, battery and violations of the Gender-Motivated Violence Act ("GMVA"). Although these claims are not

legally identical, they share a common thread:  consent can be a defense to each.  *See Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) ("Civil battery [in New York] is an intentional wrongful physical contact with another person without consent." (internal quotation marks omitted)); 6A Michael N. Giuliano, New York Jurisprudence § 5 (2d ed. 2025) ("The general rule that a person cannot recover damages for a wrong occasioned by an act to which that person has consented applies in civil actions for assault or assault and battery."); *Micari v. Mann*, 481 N.Y.S.2d 967, 969 (Sup. Ct. 1984) ("[C]onsent of the plaintiffs to the performance of the sexual acts complained of would [generally] be a complete defense."); *People v. Weinstein*, 42 N.Y.3d 439, 465 (2024) (acknowledging the "consent defense" to sex offenses which are GMVA predicates).  Henry makes his motion for summary judgment on this ground alone, arguing that it is beyond dispute that Eckhart consented to all of their sexual activity.  *See* Dkt. 389 ("Henry Br.") at 24; *see also id.* at 1 (arguing that such activity was "[a]lways consensual").[8]  He points to Eckhart's explicit messages and intimate photographs as proof positive of that consent and asserts that this evidence refutes Eckhart's testimony that she was assaulted and raped.

The Court disagrees.  While a reasonable jury could conclude that Eckhart consented to some or all of their sexual activity, it could also conclude otherwise.  In her deposition, Eckhart testified at length that Henry forced her to engage in sexual activity without her consent, and on three separate occasions.  In her words, she met him at the Marriott Marquis hotel in 2014 with the intention of discussing her career, only for Henry to lock the door, "forcefully" kiss her, "thr[o]w [her] against the wall," "quickly t[ake] off [her] dress," "thr[o]w himself on top of [her]" and "have

---

[8] Henry's defense is a targeted one:  that Eckhart participated willingly and voluntarily in all of their sexual activity. He does not argue that she was required to verbally or physically resist, nor does he raise questions about the precise scope of the consent defense in civil actions, such as whether he would be liable if he forced her into sexual activity by using threats (overt or implicit) of professional retaliation.  The Court thus addresses only Henry's argument that Eckhart affirmatively consented to all of their sexual activity.

very quick sexual intercourse with [her]." Willemin Decl. to Henry Ex. 3 at 418 (Eckhart Deposition); *see also id.* at 427 ("He forced himself on me."). Although Eckhart conceded that she never fought back or said "no," she also testified that she "didn't feel like [she] had a choice because [she] was scared of him" and "wasn't sure what would happen if [she] said no." *Id.* at 420. She also stated she did not kiss him "voluntarily" or "consensually." *Id.* at 426.

Eckhart likewise maintains that Henry used force during their sexual interactions in 2015 and 2017. She testified that, in September 2015, Henry again "forcefully kiss[ed]" her in a Fox News guest office, after which he "pinned [her] against the wall," "shoved [her] head down" and "used his hand to force [her] into giving him oral sex against her will." *Id.* at 455. And as to the incident in February 2017, Eckhart testified that he invited her to drinks to "discuss [her] career," *id.* at 503, but then "forced himself" on her, "ripped" off her dress, put "metal handcuffs on her," took naked pictures of her, hit her with his hands and belt and "forcefully rape[d]" her. *Id.* at 537–40. As she put it, she was "violently raped" and "did not consent" to these "sadistic and painful acts." *Id.* at 540–41.

This testimony is sufficient to defeat summary judgment. At this stage, the Court must accept Eckhart's testimony—that Henry forced her into sexual acts against her will—as true. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed."). Even though Henry has offered a "conflicting version[]" of what transpired—that she consented—a reasonable jury could choose to credit her narrative, and in doing so reject Henry's consent defense. *Rule*, 85 F.3d at 1011. Put simply, Eckhart's testimony "make[s] it arguable that [her] claim has merit," which precludes Henry's bid for summary judgment here. *Redd*, 678 F.3d at 174 (internal quotation marks omitted).

Henry insists that Eckhart's testimony is incredible and contradicted by other evidence, most notably the sexually charged text messages she sent him before and after the incidents in question. Neither argument moves the needle. First off, the Court may not assess Eckhart's credibility at this stage, and must resolve all "credibility questions" in her favor. *Id.* (internal quotation marks omitted); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[I]t is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage."). A jury may well find that Eckhart's text messages—many of which were sexually explicit—belie her testimony that she did not pursue or consent to the sexual interactions she had with Henry. But that credibility inquiry falls squarely within the province of the jury, and the Court may not wade into it at this stage.

As for Henry's contradicted-by-the-record argument, he is correct that summary judgment may be granted in spite of a plaintiff's testimony "in the rare circumstance where the plaintiff relies exclusively on [that] testimony, much of which is contradictory and incomplete." *Jeffreys*, 426 F.3d at 555. But this narrow exception does not apply here. There is no evidence that refutes Eckhart's assertion that the three sexual incidents were nonconsensual. To be sure, she admits to sending sexual messages and photographs that a jury could interpret as inviting sexual relations with Henry. *See People v. Jovanovic*, 700 N.Y.S.2d 156, 168–69 (1st Dep't 1999) ("[T]he jury could have inferred from the [sexual] messages that the complainant had shown an interest in [violent sex] with [defendant]."). But those messages could be read in other ways too. A reasonable jury could, for instance, find that Eckhart voluntarily sent some messages to be friendly, or even flirtatious, yet did not consent to the violent sexual encounters that followed. *See Jovanovic*, 700 N.Y.S.2d at 169 (discussing possibility that victim later "withdrew her consent"). Or a reasonable jury could conclude that some of the sexual activity was consensual while some

was not. *See id.* And even if, as Henry claims, Eckhart sent many of the messages after the alleged assaults, her therapist explained how such behavior is "fairly common" of assault victims, who often try to "placat[e] or appeas[e] the perpetrator" in order "to minimize the likelihood of additional assaults or harassment." Willemin Decl. to Henry Ex. 7 at 85. At bottom, none of the messages—or the fact that Eckhart sent them—establishes beyond dispute that she consented to all of their sexual conduct. This forecloses Henry's argument that those messages render her testimony too "contradictory" or "inconsisten[t]" to be credited at summary judgment. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010).

The record, moreover, includes evidence that Henry harassed and even assaulted other female colleagues, including one incident where he digitally penetrated a woman under a table without her consent. *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 248 (alleging that Henry "suddenly and very unexpectedly put his hand under the table and under [her] skirt and fingered her . . . without [her] consent."). A reasonable jury could believe those accounts and infer that Henry engaged in similar misconduct with Eckhart. *See Carroll v. Trump*, 124 F.4th 140, 162 (2d Cir. 2024) (affirming admission of testimony that defendant committed another sexual assault under Federal Rules of Evidence 413 and 415 and noting that "the jury could reasonably infer [from past assaults] that [defendant] engaged in similar conduct with other women"). A reasonable jury could also make a similar inference from Henry's texts, which previewed the allegedly violent nature of their encounters. *See, e.g.*, Willemin Decl. to Henry Ex. 58 ("Bruised battered begging for more" and "You needed to take your punishment"). Finally, Eckhart's ex-boyfriend testified that she told him she was sexually assaulted by a Fox News anchor—a conversation that Henry

admits took place at least a year before she filed this suit. Henry Rule 56.1 Stmt. ¶ 34.[9] While this evidence is certainly not conclusive, it nonetheless lends some support to Eckhart's contentions.

In short, the parties have offered two "conflicting versions of events" as to consent, neither of which is definitively contradicted by the record—and both of which remain possible at this stage. *Rule*, 85 F.3d at 1011. Because it is not "quite clear what the truth is," *Redd*, 678 F.3d at 174 (internal quotation marks omitted), Henry may not obtain summary judgment on the ground that Eckhart consented.

## II.    Sex Trafficking

Henry also moves for summary judgment on Eckhart's claim that he engaged in sex trafficking in violation of the Victims of Trafficking and Violence Prevention Act of 2000 ("TVPA"), 22 U.S.C. § 7107. To prevail on that claim, Eckhart must show that Henry "knowingly and in interstate or foreign commerce:  (1) recruited, enticed, harbored, transported, obtained, or maintained by any means a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used; (3) to cause the person to engage in a commercial sex act." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018) (internal quotation marks omitted).

Eckhart asserts that Henry satisfied these elements because he enticed her into sex by indicating that he could help advance her career at Fox News. Henry responds that Eckhart failed to establish a genuine dispute that he enticed her and that he knew that fraud or force would be used.

---

[9] This statement is admissible under Federal Rule of Evidence 801, which permits the introduction of a prior out-of-court statement "to rebut an express or implied charge that the declarant recently fabricated" her testimony. Fed. R. Evid. 801(d)(1)(B).

A.    Enticement

Henry first asserts that there is no dispute as to whether he "enticed" Eckhart into sex. As the Court explained in its opinion denying Henry's motion to dismiss, a defendant may satisfy this element by "making empty promises of career opportunities." *Eckhart v. Fox News Network, LLC*, No. 20-cv-5593, 2021 WL 4124616, at *8 (S.D.N.Y. Sept. 9, 2021) (citing *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 301 (S.D.N.Y. 2019) and *Noble*, 335 F. Supp. 3d at 517). Although the TVPA requires some sort of *quid pro quo*, that deal can be implicit. *See id.* at *9. For that reason, "a plaintiff's expectation of receiving improved job opportunities [in exchange for sex] is sufficient" to show enticement. *Martinez v. 189 Chrystie St. Partners, LP*, No. 22-cv-3111 (VEC), 2023 WL 5390442, at *5 (S.D.N.Y. Aug. 22, 2023) (citing *Eckhart*, 2021 WL 4124616 at *6).

Here, Eckhart testified about multiple instances in which Henry alluded to helping her career in advance of their sexual encounters. She detailed how, when she first met Henry for a drink in 2014, he "started asking [her] about [her] career," Willemin Decl. to Henry Ex. 3 at 386 (Eckhart Deposition), and then told her "he wanted to have another drink with [her] up in his room" so they could "discuss [her] career further," *id.* at 417. Once they reached his room, she says he forced himself on her and had sex with her without her consent. *See id.* at 427. After they were done, Henry told her that she could be "a star" and that "he could put [her] in the room with really powerful people and decision[]makers at Fox." *Id.* at 424. She further testified that, just before Henry allegedly raped her in 2017, he offered to introduce her to his agent and to have her as a guest on his new show. *See id.* at 534–36, 549. He also invited her to his room under the pretext of discussing her "future at the network." *Id.* at 536.

Henry makes several arguments that this testimony falls short of establishing a triable issue as to enticement, but the Court disagrees. He first asserts that he "[n]ever even discussed offering

to do anything to advance her career prior to th[eir] first sexual encounter" in 2014. Henry Br. at 16. But Eckhart specifically testified that Henry offered to discuss her career in his room before they had any sexual contact that evening. *See* Willemin Decl. to Henry Ex. 3 at 417 (Eckhart Deposition). And as other courts in this district have recognized, that sort of offer—a meeting with an influential industry figure to discuss one's career—is inherently valuable and amounts to enticement "in and of itself." *Noble*, 335 F. Supp. 3d at 521.

Henry also contends that he cannot be liable under the TVPA because Eckhart pursued him first, and because she "voluntarily engaged in sex with him for pleasure" as opposed to a commercial motive. Henry Br. at 17, 19. But there is an open factual dispute as to whether Eckhart voluntarily had sex with Henry to begin with—and even if she did, whether she did so with the hope of benefiting her career. That alone precludes the Court from granting summary judgment on this ground. In any event, even if Eckhart had been the first pursuer, that would not foreclose her TVPA claim. As the Court explained in its earlier opinion, "a person may engage in sexual activity with the same person due to enticement on one occasion and absent any enticement on another." *Eckhart*, 2021 WL 4124616, at *9; *cf. Jovanovic*, 700 N.Y.S.2d at 197–98 (discussing how a victim may withdraw consent). So even if Eckhart pursued him on one occasion, as Henry claims, she may still have been enticed on another.

Henry's final argument is that Eckhart could not have been enticed by his offer to appear as a guest on his new show because she would have known that she was unqualified to be an on-air commentator. As a threshold matter, this argument would not defeat Eckhart's claim even if it were correct, because she also testified about other offers of career support that could separately support her TVPA claim. *See, e.g.*, Willemin Decl. to Henry Ex. 3 at 424 (Eckhart Deposition) (offer to "put [her] in the room with really powerful people"); *id.* at 536 (offer to introduce her to

Henry's agent). At any rate, evidence in the record suggests that Eckhart may have been qualified to be an on-air guest. *See* Eckhart Rule 56.1 Stmt. to Henry ¶¶ 163–64 (stating that Eckhart served as a guest on Fox News shows twice in 2018). Because the Court cannot conclude that Eckhart's reliance on Henry's alleged promises was unreasonable, it may not grant summary judgment on that ground.

### B.     Knowledge of Force or Fraud

Henry also contends that Eckhart failed to create a genuine dispute as to the TVPA's force-or-fraud element. This element requires Eckhart to show that Henry was "aware[]" that he would use "force" or "fraud" to "cause [her] to engage in a sex act" at the time he recruited or enticed her. *Noble*, 335 F. Supp. 3d at 518. "In other words, Eckhart must [show] that Henry had an awareness or understanding that, if things go as he planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex transaction." *Eckhart*, 2021 WL 4124616, at *10 (internal quotation marks omitted).

A reasonable jury could conclude that Henry had such knowledge here. First, Eckhart testified that Henry made varied offers to help her career over the span of several years, yet there is no evidence that Henry ever followed through on them. That fact would support a reasonable inference that Henry knew he was making fraudulent promises that he would never fulfill. *See Noble*, 335 F. Supp. 3d at 518. Those offers, moreover, became more elaborate and generous over time, as Henry went from general offers of career support to concrete proposals to introduce Eckhart to his agent and put her on his show. This escalation over time likewise indicates an awareness that the promises were empty. *See Eckhart*, 2021 WL 4124616, at *10 (citing *Noble*, 335 F. Supp. 3d at 518).[10]

---

[10] Eckhart also points to Henry's affairs with other women as evidence that he had a "modus operandi" of coercing women into sex with fraudulent offers of career support. But much of that evidence is inadmissible hearsay, *see*

A reasonable jury could also find that Henry was aware he would use force to have sex with Eckhart at the time that he initially enticed her. As the record shows, Henry sent her messages in the lead up to the February 2017 encounter that indicated he intended to use violence against her. *See, e.g.*, Eckhart Rule 56.1 Stmt. to Henry ¶ 51 (Henry texting Eckhart that she was "[g]onna get tossed around like a rag doll"). And Eckhart testified that Henry also used force during their earlier sexual encounters, including by forcefully kissing her, throwing her up against a wall, throwing her onto a bed and using his hand to force her to give him oral sex. *See id.* at ¶¶ 197–200, 207. The fact that Henry is alleged to have used force during all three of their sexual encounters could provide strong support for a jury finding that he knew he would do so at the time of the alleged enticement.

## III.  Revenge Porn

Henry also moves for summary judgment on Eckhart's claim that he violated New York's revenge porn law, N.Y. Civ. Rights Law § 52-b, by filing explicit photographs of her on the public docket in this case. He first argues that some of those photographs do not in fact depict her, which would foreclose her claims as to those pictures. As for the other photographs that do depict her, he contends that none meet the legal criteria of revenge porn under the statute. The Court agrees on both fronts.

Starting with the statute, Section 52-b prohibits the dissemination of certain explicit photographs of people who are unclothed or engaged in sexual activity with another person:

---

Willemin Decl. to Fox Ex. 73 (direct messages from Brooke Hammerling to Eckhart); Eckhart Rule 56.1 Stmt. to Henry ¶¶ 263–64 (news article), which the Court may not consider at summary judgment, *see Patterson*, 375 F.3d at 222. As for the other women, nothing indicates that Henry made any false promises to Jane Doe 1; to the contrary, it appears that he *did* follow through on his offer to put in a good word for her at the network. *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 253; Willemin Decl. to Henry Ex. 5 at 228–29 (Henry Deposition). And while it appears that Henry may have falsely told another woman that he helped get her a role at Fox News, that single incident is not enough to establish a modus operandi. *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 248.

> (1) Any person depicted in a still or video image . . . shall have a cause of action against an individual who, for the purpose of harassing, annoying or alarming such person, disseminated or published, or threatened to disseminate or publish, such still or video image, where such image:
>> (a) was taken when such person had a reasonable expectation that the image would remain private; and
>> (b) depicts (i) an unclothed or exposed intimate part of such person; or (ii) such person engaging in sexual conduct, as defined in subdivision ten of section 130.00 of the penal law, with another person; and
>> (c) was disseminated or published, or threatened to be disseminated or published, without the consent of such person.

N.Y. Civ. Rights Law § 52-b. Paragraph (b)(ii) incorporates the definition of "sexual conduct" from the New York Penal Law, which defines such conduct as "vaginal sexual contact, oral sexual contact, anal sexual contact, aggravated sexual contact, or sexual contact." N.Y. Penal Law § 130.00(10). That criminal provision further defines "sexual contact" as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party," and clarifies that this "includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." *Id.* § 130.00(3).

As an initial matter, Henry argues that Eckhart's claims as to some of the photographs must fail because they are not pictures of her to begin with. That is correct. As Eckhart herself testified, five of the fifteen photographs do not depict her and are instead images of other women that she found on the Internet. *See* Willemin Decl. to Henry Ex. 3 at 645 (Eckhart Deposition); *see also* Dkt. 85 Exs. I, M, Q, T, U. Because Section 52-b limits its private right of action to those "depicted in [the] still or video image," Eckhart may not bring claims premised on those five photographs.

The more hotly disputed issue is whether the remaining photographs—which indisputably do depict her—are actionable under Section 52-b. *See* Dkt. 85 Exs. G, H, J, K, L, N, O, P, R, S. Eckhart offers two reasons for why they are, but neither bears scrutiny.

31

She first asserts that several of the photographs are actionable under Section 52-b(1)(b)(i) because they depict her exposed "intimate part[s]." While Section 52-b does not define this term, its criminal counterpart defines it to mean "the naked genitals, pubic area, anus or female nipple of the person." N.Y. Penal Law § 245.15(2). The parties agree that none of the photographs depict Eckhart's naked genitals, anus or nipples. Eckhart nonetheless argues that several of the photographs of her in lingerie are actionable because they depict her unclothed or exposed "pubic area," which is the region "of or near the sexual organs on the outside of a person's body." *Pubic*, Cambridge Dictionary (last visited March 12, 2025), https://dictionary.cambridge.org /us/dictionary/english/pubic.

That argument fails. In each of the pictures in question, Eckhart is wearing a bottom piece of underwear such that none of her genitals are visible whatsoever. *See* Dkt. 85 Exs. L, N, S. While she contends that one can still see her "pubic area" around the edges of her underwear, in fact her pubic area is obscured by that underwear. And none of the exposed areas are proximate enough to her genitals so as to qualify as her pubic area under the statute.

To be sure, the Court indicated in its earlier opinion that at least one of the redacted pictures depicted a woman's pubic area. *See Eckhart*, 2021 WL 4124616, at *24 (denying Henry's motion to dismiss this claim). As it turns out, however, these pictures were ones of other women, not Eckhart. *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 72. Indeed, these pictures illustrate by comparison why the pictures of Eckhart are not actionable under paragraph (b)(i). The statute does not prohibit "suggestive" or "nearly revealing" images, but only those that depict the pubic area itself. These photos of other women meet that definition; they show a fully exposed female pubic area with only narrow redactions to obscure the genitals, leaving the rest of the surrounding area

fully visible. *See* Dkt. 85 Ex. I, Q. That same region, by contrast, is entirely covered by clothing in the pictures of Eckhart, which thus do not depict her "pubic area" as required by the statute.

The Court also rejects Eckhart's second argument that one of the photos shows her "engaging in sexual conduct . . . with another person" in violation of Section 52-b(1)(b)(ii). As both parties agree, this picture depicts Eckhart inserting her fingers under the waistband of her underwear toward her pubic area. *See* Dkt. 85 Ex. N. Relying on only part of the relevant statutory language, Eckhart argues that "sexual conduct" is defined to include "sexual contact," which means "any touching of the sexual or intimate parts of a person for the purpose of gratifying sexual desire of either party." N.Y. Civ. Rights Law § 52-b(1)(b)(ii) (cross-referencing N.Y. Penal Law § 130.00(10) for the definition of "sexual conduct"); *see also* N.Y. Penal Law § 130.00(1), (10) (defining "sexual contact"). According to her theory, this photo shows sexual conduct because Eckhart is touching *herself* in order to gratify the sexual desire of Henry, to whom she sent the picture. In other words, Eckhart reads Section 52-b(1)(b)(ii) to cover not only pictures depicting two parties touching each *other* for sexual purposes but also photos of one party touching themselves, even if there is no physical contact with another person.

The plain text forecloses this argument. "It is . . . a cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted). Here, if the legislature had intended for Section 52-b(1)(b)(ii) to impose liability on those who send pictures of a victim touching *themselves*, then it could have drafted the provision to cover pictures that depict a "person engaging in sexual conduct." But the legislature included an additional—and crucial—qualifier: a "person engaging in sexual conduct, as defined in [Section 130.00(10)], *with another person*." N.Y. Civ. Rights Law § 52-b(1)(b)(ii) (emphasis added). This specific phrasing

can only be read as limiting paragraph (b)(ii) to pictures that depict touching between two people—otherwise, the phrase "with another person" would be read out of the statute entirely. *See Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477–78 (2017).

This reading finds reinforcement in the structural interplay between paragraph (b)(ii) and New York Penal Law § 130.00, which supplies the definition of "sexual conduct." N.Y. Penal Law § 130.00(10) (defining sexual conduct as "vaginal sexual contact, oral sexual contact, anal sexual contact, aggravated sexual contact, or sexual contact"). Once that definition of "sexual conduct" is plugged into paragraph (b)(ii), it would read as covering any image that "depicts . . . such person engaging in . . . *sexual contact with another person*." *See id.* (emphasis added). Again, the inclusion of "with another person" can only mean that the provision covers physical contact between two people—not solitary acts. There is no other possible meaning of "contact with another person."

New York precedent further confirms that the text means what it says. In *People v. Ditta*, the New York Court of Appeals construed the phrase "sexual contact" in Section 130.00 and explained that it occurs when "the defendant himself touched the other person, . . . caused the other person to touch him, or . . . caused the other person to touch a third person." 52 N.Y.2d 657, 661 (1981). In the four decades since, other courts in the state have repeatedly recited this same standard, which limits "sexual contact" to instances where there is contact between two persons. *See, e.g.*, *People v. Grubert*, 76 N.Y.S.3d 101, 103 (2d Dep't 2018) ("Sexual contact could mean the defendant touching [the victim], [the victim] touching the defendant, or the defendant causing a third person to touch [the victim]."); *People v. Shoemaker*, 641 N.Y.S.2d 914, 915 (3d Dep't 1996); *People v. Freeman*, 950 N.Y.S.2d 493, 2012 WL 255762, at *5 (N.Y. Crim. Ct. Jan. 30, 2012); *see also* N.Y. Penal Law § 130.00 *supplementary practice commentaries* (discussing

SPA-35

"Sexual contact" and *Ditta*).  No court has embraced, or even hinted at, the sweeping reading Eckhart presses here.

Eckhart's only argument to the contrary is that "sexual contact" is defined in a non-exclusive manner such that it could extend to a single person touching themselves.  *See* N.Y. Penal Law § 130.00(3) ("'Sexual contact' means any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party.  It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed.").  According to Eckhart, because this provision uses the non-limiting term "includes," it could be stretched to cover instances of self-touching.

That argument fails on multiple fronts.  First, as already discussed, Section 52-b(1)(b)(ii) includes the "with another person" qualifier, which by its plain text excludes pictures that depict mere self-touching.[11]  Second, the amendment history of Section 130.00(3) indicates that "sexual contact" encompasses only a few types of touching, none of which is victim-on-victim.  Originally, Section 130.00(3) defined "sexual contact" as simply "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party," without the clarifying sentence that "[i]t includes the touching of the actor by the victim," and so on.  N.Y. Penal Law § 130.00 *supplementary practice commentaries* (discussing "Sexual contact" element).  The *Ditta* court then interpreted this original definition of "sexual contact" as limited to three categories of touching:  victim touched by actor, actor touched by victim and victim touched by third person. Three years later, the legislature amended the statute, adding the clarifying sentence that sexual

---

[11] Of course, if the image also depicted nudity—"an unclothed or exposed intimate part" of the victim—then it would be independently actionable under paragraph (b)(i). The pictures of Eckhart do not meet that criteria either, as already discussed.

contact "includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." Notably, this amendment mentioned only two of the three categories identified in *Ditta*—actor-touching-victim and victim-touching-actor—yet omitted the touching-by-third-person category. *Id.*

Contrary to Eckhart's assertion, this amendment cannot be construed as expanding "sexual contact" to include self-touching. For one thing, every example in the clarifying sentence involves touching between the actor and victim (including indirect touching by "emission of ejaculate"), which indicates that "sexual contact" is limited to instances of interpersonal touching. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). More telling still, while *Ditta* recognized that touching by a third person could also qualify, the legislature jettisoned that category when it amended the statute. If anything, this deliberate omission signals that Section 130.00(3) is now *narrower*, not broader, than it was pre-amendment, as it no longer includes third-person touching. There is thus no textual basis to argue that the statute now extends to self-touching too. And in any event, Eckhart's strained interpretation collides with the statute's clear requirement that the image depict a "person engaging in sexual conduct . . . with another person," as already discussed. N.Y. Civ. Rights Law 52-b(1)(b)(ii).

The necessary conclusion is that a plaintiff may not bring a "sexual contact" claim under Section 52-b(1)(b)(ii) for dissemination of photographs that show a plaintiff touching only herself. The Court thus grants Henry's motion for summary judgment on this claim.

36

SPA-37

**IV.    Harassment**

Henry and Fox News also move for summary judgment on Eckhart's sexual harassment claims, which allege several different forms of liability under the New York City Human Rights Law ("NYCHRL") and New York State Human Rights Law ("NYSHRL").  Eckhart's claims against Henry assert that he is directly liable under the NYCHRL for sexually harassing her.  Her claims against Fox News assert that it is (1) indirectly liable under the NYCHRL because it should have known that Henry would assault her yet failed to stop him, and (2) indirectly liable under the NYSHRL because it knew about and condoned Henry's alleged misconduct.  Although the Court rejects Henry's arguments, it agrees that Fox News is entitled to summary judgment on these claims.

**A.    NYCHRL Claims Against Henry**

Henry moves for summary judgment on Eckhart's NYCRHL claim against him, arguing that he could not have harassed her because she consented to his communications and conduct. *See* Henry Br. at 25.  As discussed above, however, a reasonable jury could conclude that Eckhart did not consent to some or all of Henry's alleged misconduct.  Henry's motion as to this claim is thus denied.

**B.    NYCHRL Claim Against Fox News**

Eckhart also brings NYCHRL claims against Fox News under theories of indirect liability. Under the NYCHRL, an employee's harassing conduct may be imputed to his employer only where (1) "the offending employee 'exercised managerial or supervisory responsibility'" over the victim, or (2) "the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action,'" or (3) the employer 'should have known' of the offending employee's unlawful discriminatory conduct yet

'failed to exercise reasonable diligence to prevent [it].'" *Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 479 (2010) (quoting N.Y.C. Admin. Code § 8-107(13)(b)(1)–(3)).

Eckhart invokes two of these theories here, arguing that Fox News is liable because Henry was her "manager or supervisor," N.Y.C. Admin. Code § 8-107(13)(b)(1), and because it should have known about his alleged misconduct and failed to prevent him from harming her, *id.* § 8-107(13)(b)(3). As Fox News correctly notes, however, the Court already rejected the first argument in its earlier opinion resolving Fox News' motion to dismiss. *See Eckhart*, 2021 WL 4124616, at *18 (explaining that NYCHRL requires that employee have "exercised managerial or supervisory responsibility over victim" and finding that "Henry was not Eckhart's manager or supervisor" (internal quotation marks omitted)). Eckhart did not move for reconsideration on that ground, so the law-of-the-case doctrine bars her attempt to re-raise it here. *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570–71 (S.D.N.Y. 2017).

Fox News can thus be held liable for Henry's actions only if its management or supervisors knew or should have known about that purported misconduct yet failed to prevent Henry from harming Eckhart. On this record, the Court agrees that no reasonable jury could make that finding.

As a threshold matter, there is no direct evidence that Fox News was aware of Henry's alleged harassment of Eckhart before it occurred. Eckhart acknowledges that she did not tell anyone at the network about their relationship until after she was terminated in mid-2020. *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 150. Nor is there any indication that Henry revealed their relationship to others, or that Fox News management or HR otherwise learned about it. *See id.* ¶ 156; *see also* McKenna Decl. Ex. 2 at 417 (Henry Deposition).

Attempting to plug this evidentiary gap, Eckhart asserts that Fox News knew that Henry was harassing *other* women at the network, which put it on notice that he might do the same (or

worse) to her.  She points to several pieces of evidence in support of that theory, including that Fox News knew about Henry's extramarital affairs, that women came forward with accusations against him in April 2017 and that Fox News sent him to sex rehabilitation treatment in May 2016.

No reasonable jury could find Fox News liable based on that evidence.  For starters, even though Fox News eventually learned about Henry's extramarital affairs, it did not know about many of them until after Eckhart and Henry's final sexual encounter in 2017.  *See* McKenna Decl. Ex. 114 ¶ 13 (Jane Doe 1 Declaration) ("I did not report my relationship with [Henry] to . . . Human Resources."); *id.* Ex. 115 ¶ 10 (Jane Doe 4 Declaration) ("I never told anyone at Fox News about my experiences with Henry."); *id.* Ex. 2 at 49–50, 420 (Henry Deposition) (testimony that Fox News never learned about other affair and did not question him about it); Fox Rule 56.1 Reply ¶ 186 (other woman did not disclose Henry affair to network until April 2017).  Because there is no evidence that Fox News learned about these affairs until April 2017 or later, no reasonable jury could find that they put it on notice that Henry would assault her.

The only affair that Fox News learned of before that date was the affair Henry had with a stripper between 2015 and 2016.  *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 12.  But the record establishes that this relationship was "consensual," *id.*—which would not have put Fox News on notice that Henry would harass or assault Eckhart.  This conclusion aligns with precedent from other courts applying comparable harassment laws, which have concluded that awareness of consensual affairs does not put an employer on notice that nonconsensual misconduct will follow. *See, e.g.*, *King v. MCI Telecomms. Corp.*, No. 94 C 421, 1997 WL 124254, at *7 n.2 (N.D. Ill. Mar. 17, 1997) (knowledge of an alleged harasser's "consensual" sexual relationship with his previous secretary "cannot reasonably be regarded as giving [the employer] notice that [he]

sexually harassed his secretaries"), *aff'd*, 142 F.3d 440 (7th Cir. 1998).[12]  In one particularly apt case, a plaintiff argued that her employer "should have known" that a colleague would harass her because he had "consensual sexual relationships with two different employees," one of which his supervisors knew about. *Schmidt v. Medicalodges, Inc.*, 492 F. Supp. 2d 1302, 1309 (D. Kan. 2007).  The court rejected that argument, holding that an employer's "knowledge of [a consensual sexual] relationship does not raise a reasonable inference that [the defendant] was also engaging in unwelcome sexual harassment." *Id.*

This rule is also consistent with New York law on constructive knowledge, which often arises in the analogous context of negligent supervision.  As with NYCHRL lawsuits, a claim for negligent supervision requires the plaintiff to show that her employer "knew" or "should have known" that another employee would engage in the misconduct that harmed her. *Travis v. United Health Servs. Hosps., Inc.*, 804 N.Y.S.2d 840, 884–85 (3d Dep't 2005) (internal quotation marks omitted).  In applying that should-have-known standard, courts have required plaintiffs to show that the employer was aware of "prior misconduct" by the employee that was "*of the same kind that caused the injury*" to the plaintiff. *Doe v. Alsaud*, 12 F. Supp. 3d 674, 681 (S.D.N.Y. 2014) (emphasis added); *Zanghi v. Laborers' Int'l Union of N. Am.*, 778 N.Y.S.2d 607, 608 (4th Dep't 2004) (employer must have knowledge of employees' "propensit[y] . . . for the type of behavior that caused the plaintiff's harm"); *cf. Kirkman ex rel. Kirkman v. Astoria Gen. Hosp.,* 611 N.Y.S.2d 615, 616 (2d Dep't 1994) ("for the sort of behavior which caused the injured party's harm").  For instance, even knowledge that an employee "sexually harass[ed] other employees by attempting

---

[12] *See also Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (professor's consensual relationships with two students did not put university on notice that students, including plaintiff, were at risk of sexual harassment); *Jackson v. Cintas Corp.*, 391 F. Supp. 2d 1075, 1101 (M.D. Ala. 2005) ("The court is not persuaded that the 'rumors' of [the employee's] alleged consensual affair with another subordinate employee is sufficient to place [the employer] on constructive notice of [the employee's] alleged propensity to engage in unwelcome sexually harassing conduct.").

to date them" will not put his employer on notice that he would "commit a sexual assault"—a much more serious form of misconduct. *Doe*, 12 F. Supp. 3d at 681 (citing *Anderson v. Adam's Mark Hotels & Resorts,* No. 99–1100, 2000 WL 390107, at *1–2 (10th Cir. 2000)). Because sexual harassment is a "lesser allegation of prior wrongdoing," knowledge of the former will not put an employer on notice of the latter. *Id.* ("[G]eneral, unrelated or lesser allegations of prior wrongdoing are insufficient."). Put simply, even "a propensity to sexually harass is not sufficient to establish a propensity to sexually assault." *O'Rear v. Diaz*, No. 24-cv-1669 (PAE), 2025 WL 283169, at *11 (S.D.N.Y. Jan. 23, 2025) (quoting *Lee v. Albaran*, No. 23-cv-11215 (NSR), 2024 WL 4987310, at *6 (S.D.N.Y. Dec. 5, 2024)).

By the same logic, Fox News' knowledge of Henry's consensual affairs did not put it on notice that he would engage in nonconsensual conduct like harassment or assault. Consensual extramarital affairs may well be a form of "wrongdoing," but they are of a different "type" and certainly a "lesser" degree than nonconsensual sexual harassment and assault. *Doe*, 12 F. Supp. 3d at 681. To impute knowledge of such conduct to an employer, at minimum a plaintiff will need to show that it was aware of prior nonconsensual sexual misconduct by the employee.

Eckhart offers no such evidence here. While she seeks to invoke statements by Claman and another individual at Fox News' DC bureau that Henry was a "sex addict" and "unfaithful to his wife," neither claim involved Henry engaging in anything nonconsensual or unwelcome. *See* Fox Rule 56.1 Reply ¶ 518 (statement from Claman to Eckhart); Willemin Decl. to Fox Ex. 1 at 17 (testimony from other individual about Henry's unfaithfulness); *see also* Fox Rule 56.1 Reply ¶ 182 (complaint by journalist at Fox News that Henry was allowed to return to work after consensual affair with stripper). At best, Eckhart points to the declaration by Jane Doe 2—the woman who testified that she "likely" told "people at Fox News" that Henry sent her an unsolicited

picture of his penis. McKenna Decl. Ex. 116 ¶ 11. The problem with this evidence is that Jane Doe 2 clarified that she "ha[d] no specific recollection" of actually telling others at Fox, *id.*, nor did she testify that she had told anyone who was a "manager[] or supervisor[]" at the network, as would be required to impute knowledge under the NYCHRL. *See* N.Y.C. Admin. Code § 8-107(13)(b)(2). Opposing summary judgment requires "specific facts," and "speculation" that this woman might have told others who might have been management is not enough. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks omitted) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation.").

Other reports of misconduct by Henry came too late in time. For instance, Eckhart points to the report Fox News received in April 2017 from a producer who had a consensual affair with Henry and who also conveyed several rumors she had heard about his other affairs and "sexting" incidents. Fox Rule 56.1 Reply ¶ 186. This report, however, came two months after Henry and Eckhart's last sexual encounter that February. Because Fox News could not have "prevent[ed]" the alleged harms to Eckhart with this information, it cannot save her NYCHRL claim.[13] N.Y.C. Admin. Code § 8-107(13)(b)(3). The same is true of the various other allegations against Henry that Fox News first learned about over the course of this lawsuit. *See, e.g.*, Fox Rule 56.1 Reply ¶ 286 (accusation by woman that Henry digitally penetrated her at going-away party).

---

[13] Eckhart's opposition does not invoke—or even mention—the text messages that Henry sent her in 2018, nor did Eckhart cite those messages at argument after Fox News asserted that this producer's report occurred after their last sexual encounter. She instead argued only that Fox News is liable because it failed to prevent Henry from sexually assaulting her in 2014, 2015 and 2017. *See* Eckhart Opp. to Fox at 1–4, 23–27. When, as here, "a plaintiff fails to raise claims in opposition to dismissal in the district court, any such claims are forfeited." *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 487 n.9 (S.D.N.Y. 2017) (deeming fraud claims premised on certain misstatements forfeited when not raised in opposition, even though they were alleged in pleadings); *Nigro v. City of New York*, No. 19-cv-2369 (JMF), 2020 WL 7629455, at *3 (S.D.N.Y. Dec. 22, 2020) (finding legal theory forfeited when plaintiff "did not press [it] in his opposition" and opted to rely on other theory instead). Accordingly, Eckhart has forfeited any argument that Fox News is liable because it failed to prevent Henry from sending these messages in 2018.

Finally, Eckhart makes an inferential argument that Fox News must have suspected that Henry engaged in nonconsensual misconduct because it sent him to sexual rehabilitation therapy in 2016 after learning of his affair with a stripper. In her view, the network would only have taken a step that drastic if it surmised that he was engaging in more serious misconduct—as she claims he in fact was.

The problem with this argument is that it is pure speculation. Despite years of document discovery and depositions of decisionmakers at the network, Eckhart offers no evidence that Fox News sent Henry to treatment because it suspected harassment or assaults. As just surveyed at length, nothing in the record indicates that Fox News knew of such nonconsensual behavior at the time, toward Eckhart or others. In fact, Eckhart even deposed Fox News' head of HR, Kevin Lord, who maintained that he knew of no reason other than the stripper affair for referring Henry to treatment. *See* Willemin Decl. to Henry Ex. 8 at 73 (Lord Deposition). She likewise deposed Denise Collins, the senior VP of HR, who shared Lord's understanding. *See* Willemin Decl. to Fox Ex. 3 at 74 (Collins Deposition); Willemin Decl. to Henry Ex. 1 at 239 (Collins Deposition). Eckhart may suspect that Fox News had other motivations for referring Henry to treatment, but on this record that is no more than a hunch—which cannot "provide a basis upon which to deny the motion" for summary judgment. *Scotto*, 143 F.3d at 114 (internal quotation marks omitted).

### C.    NYSHRL Claim Against Fox News

For similar reasons, the Court also grants Fox News' motion for summary judgment on Eckhart's claim that it condoned Henry's sexual misconduct in violation of the NYSHRL. Like with the NYCHRL, an employee's misconduct can be imputed to his employer under the NYSHRL. This requires, however, a showing that "the employer became a party to [that misconduct] by encouraging, condoning, or approving it." *Forrest v. Jewish Guild for the Blind*,

3 N.Y.3d 295, 311 (2004).  And unlike the NYCHRL, imputing liability by condonation requires "actual notice."  *Int'l Healthcare Exch., LLC v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007); *Swiderski v. Urb. Outfitters, Inc.*, No. 14-cv-6307 (JPO), 2017 WL 6502221, at *9 (S.D.N.Y. Dec. 18, 2017).  A plaintiff must therefore do more than show her employer "should have known" about the misconduct—she must show that it knew about the misconduct and then "forg[a]ve[]" or "accept[ed]" it "after-the-fact."  *In re State Div. of Hum. Rts. ex rel. Greene v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985).

Eckhart cannot make that showing here.  Fox News did not have actual notice of Henry's alleged misconduct towards her until she first reported it to the network through her counsel on June 25, 2020—three years after their last sexual encounter.  Eckhart Rule 56.1 Stmt. to Fox ¶ 151.  Once the network finally learned of his behavior, its response was the opposite of forgiveness:  it swiftly investigated and terminated him just six days later.  *Id.* ¶ 174.  Because no reasonable jury could find on this record that Fox News condoned Henry's behavior toward Eckhart after learning of it, summary judgment is granted as to this claim.

## V.     Retaliation

Fox News also moves for summary judgment on Eckhart's claims that it fired her in retaliation for complaining about sexual harassment.  Eckhart brings these claims under Title VII, the NYSHRL, and the NYCHRL.  These federal and state law claims are reviewed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (citing 411 U.S. 792 (1973)).  A plaintiff must first establish a *prime facie* case of retaliation by showing (1) "participation in a protected activity," (2) "the defendant's knowledge of the protected activity," (3) "an adverse employment action," and (4) "a causal connection between the protected activity and the adverse

employment action." *Id.* (internal quotation marks omitted). If she does, the burden shifts to the defendant, who must "articulate some legitimate, non-retaliatory rationale" for its actions. *Id.* at 845. The plaintiff must then show that the proffered reason is pretextual and that retaliation was the "but-for cause" of her termination. *Id.* at 845–46.

Fox News contends that Eckhart failed to make out a *prima facie* case, and that even if she had she could not rebut Fox News' legitimate reasons for terminating her. The Court agrees on both fronts.

### A.     *Prima Facie* Case

First, no reasonable jury could find that Eckhart engaged in "protected activity," which defeats her *prima facie* case at the threshold. *Id.* at 844. Protected activity means conduct that "put[s] the employer on notice that the complainant believes that discrimination is occurring." *Eckhart*, 2021 WL 4124616, at *20 (internal quotation marks omitted). "No magic words must be used when making such a complaint, so long as the employer could reasonably have understood that the employee was complaining about discrimination." *Id.* (alterations and internal quotation marks omitted).

Eckhart argues that she engaged in protected activity on February 10, 2020, when she met with Collins and Hirst and told them she was working in a "toxic environment." *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 92. Although Eckhart never mentioned sexual or gender-based harassment by name, she says that Collins should have "understood" her complaint to be "implicating" such harassment. Eckhart Opp. to Fox at 32. As Eckhart points out, the Court accepted this argument at the motion to dismiss stage, finding it plausible that Collins had understood Eckhart's comment as raising concerns about sexual harassment.

45

That possibility, however, has since been refuted by discovery. Most significantly, Eckhart's notes memorializing the February 10 meeting concede that she did *not* convey concerns about sexual harassment to Collins: "In addition to the emotional and verbal abuse that goes on, I have not yet mentioned the sexual harassment that goes on at every level in this building that I've experienced first-hand on office property." Eckhart Rule 56.1 Stmt. to Fox ¶ 96. Put simply, not even Eckhart believed that she had mentioned sexual harassment to Collins. In fact, her notes stated that she might raise such a complaint to HR at some point in the future but "still remain[ed] frightened" to do so. *Id.* ¶ 363 ("I plan to follow-up with Human Resources on the status of this situation, but still remain frightened to come forward with my sexual harassment claims."). No reasonable jury could conclude that Collins divined a sexual harassment complaint from Eckhart's statements when Eckhart repeatedly acknowledged that she said nothing of the sort.

The rest of the February 10 conversation further dispels the notion that Eckhart's comments were interpreted as raising sexual harassment. As Eckhart concedes, she primarily complained to Collins and Hirst about the "mean girls" environment at the network, and mentioned various incidents where others had screamed at, cursed at and otherwise bullied her. *Id.* ¶ 92–93. None of these complaints implicated sexual harassment, however. Indeed, Eckhart even identified several of the culprits by name—all of whom were female. Because these were only "[g]eneralized complaints of unfair treatment," they cannot "qualify as a protected activity." *Eckhart*, 2021 WL 4124616, at *38 (quoting *McGullam v. Cedar Graphics, Inc.*, No. 04-cv-2891 (AKT), 2008 WL 3887604, at *9 (E.D.N.Y. Aug. 20, 2008), *aff'd*, 609 F.3d 70 (2d Cir. 2010)).

Eckhart also points to the fact that Collins asked her whether "she had been sexually harassed" during her June 12, 2020 termination meeting—a statement that the Court relied on in denying Fox News' motion to dismiss. *Eckhart*, 2021 WL 4124616, at *39 (citing Third Amended

Complaint).  At the time, it appeared that Collins had raised this issue out of the blue, which made it plausible that she had interpreted Eckhart's earlier "toxic environment" statement to refer to sexual harassment and was now following up about that topic.  But once again, discovery has refuted that inference.  As it turns out, Eckhart was the first party to refer to "sexual harassment" at the termination meeting—when she read from a prepared script protesting her firing—which then prompted Collins to ask her if she had indeed been harassed.  Eckhart Rule 56.1 Stmt. to Fox ¶ 126.  Given that timeline, Collins' question does nothing to suggest that she believed Eckhart to have raised sexual harassment several months before.

Nor does Eckhart offer evidence of "a causal connection between the protected activity and the adverse employment action"—the fourth element of a *prima facie* case.  *Zann Kwan*, 737 F.3d at 844.  According to Eckhart, she made her complaint about a "toxic environment" on February 10, 2020 and was then placed on a PIP on March 6, 2020.  This close "temporal proximity," in her view, suggests that she was placed on the PIP (and later fired) because of her complaint.  Eckhart Opp. to Fox at 32.

That argument too fails.  "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  That describes this case.  Eckhart's performance issues—including her constant lateness, regular absences, disclosure of Fox News' proprietary graphics package and misappropriation of its resources—were well-documented throughout 2019, the year before Eckhart made her purported complaint.  She even received a "Below Expectations" rating of 2 out of 5 in her 2019 review.  Eckhart Rule 56.1 Stmt. to Fox ¶¶ 40–42.  And as the record shows, Collins and Hirst were considering placing Eckhart on a PIP *before* she made the February 10,

2020 complaint. *Id.* ¶ 67. They then had the February 10 meeting with Eckhart, and formally placed her on the PIP on March 6, after Hirst observed that Eckhart continued to be late and absent from work. *See* McKenna Decl. Ex. 13 at 4. In other words, Eckhart was on the brink of being placed on a PIP in advance of her supposed complaint, which defeats any causal inference.

At bottom, no reasonable juror could conclude that Eckhart engaged in protected activity when she complained of a toxic environment at the February 10, 2020 meeting, or that such a complaint was causally tied to her placement on a PIP or later termination. These deficiencies alone foreclose Eckhart's claim.

**B.      Legitimate, Non-Retaliatory Reasons**

Even if Eckhart had made out a *prima facie* case, her claims would still fail at the third step of the *McDonnell-Douglas* standard. Under this framework, the burden would shift to Fox News to "articulate some legitimate, non-retaliatory rationale" for terminating her. *Zann Kwan*, 737 F.3d at 845. Fox News has done so here. As Hirst and Collins explained at the June 2020 termination meeting, Eckhart had been habitually late for work, prematurely disclosed a proprietary graphics package on social media, misappropriated company resources for a charity event and consistently performed poorly while on her PIP. *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 124. Because those are legitimate reasons for terminating her, Eckhart's retaliation claim could proceed only if she can show they were pretextual, at the third step of *McDonnell-Douglas*. *Zann See Kwan*, 737 F.3d at 845–46.

On this front, Eckhart insists that the real reason for her termination was because she raised sexual harassment "complaints" to Collins at their February 10, 2020 meeting. She argues that her supposed performance issues were pretextual and "fabricated" because she had received "constant[] praise[]" at work. Eckhart Opp. to Fox at 33. But the record belies that claim.

Although Eckhart had received praise through 2018—and even a promotion and 4 out of 5 annual rating—the tide turned soon thereafter.  Her 2019 performance review was "Below Expectations"—2 out of 5—and flagged her habitual lateness as a key issue.  Eckhart Rule 56.1 Stmt. to Fox ¶¶ 40–42.  She received several "final warnings" about tardiness not long after, *id.* ¶¶ 43, 45, and then in the fall of 2019 committed the two infractions where she mistakenly revealed the new graphics packages and misrepresented her title at Fox News at an outside event, *id.* ¶¶ 47–60.  These issues continued to pile up, which prompted Collins and Hirst to put her on a PIP and subsequently terminate her when she did not improve.  Nothing indicates that Eckhart's performance issues were "fabricated or exaggerated," despite Eckhart's claim to the contrary.  Eckhart Opp. to Fox at 33.  Because Eckhart offers nothing indicating pretext, her claim also fails at the third step of the *McDonnell-Douglas* framework.

## VI.    Negligent Supervision

Finally, Fox News moves for summary judgment on Eckhart's common-law claim that Fox News negligently supervised, retained and disciplined Henry.  It argues that this claim is categorically barred by the New York Workers' Compensation Law, which supplies the exclusively remedy for damages allegedly caused by the negligence of an employer.  Fox News Br. at 33.

The Court agrees.  As the New York Workers' Compensation Law states, "[t]he right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee . . . when such employee is injured or killed by the negligence or wrong of another in the same employ."  N.Y. Workers' Comp. L. § 29(6).  The Second Circuit has confirmed that this exclusive-remedies provision bars claims like the one brought by Eckhart here.  *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 138 (2d Cir. 2001) (rejecting negligent supervision claim brought

SPA-50

by flight attendant alleging coworker raped her).  Eckhart conceded this point at oral argument and advanced no argument that could save this claim.  The Court thus grants Fox News' motion for summary judgment on this claim.

### CONCLUSION

For these reasons, Henry's motion for summary judgment is granted as to Eckhart's revenge porn claims but denied as to her claims for gender-motivated violence, assault, battery, sex trafficking and harassment.  Fox News' motion for summary judgment is granted in its entirety. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 367, 382, 384, 387 and 388.  Trial of Eckhart's remaining claims against Henry is hereby scheduled for May 12, 2025.

SO ORDERED.

Dated:     March 12, 2025
               New York, New York

Ronnie Abrams
United States District Judge

SPA-51

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
JENNIFER ECKHART,

                 Plaintiff,

      -against-                                         20 **CIVIL** 5593 (RA)

                                                       **JUDGMENT**

ED HENRY and FOX NEWS NETWORK, LLC,

                 Defendants.
-----------------------------------------------------------X

     It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Order dated June 16, 2025, the Court granted Defendant Fox New Network LLC's motion for summary judgment and denied Defendant Ed Henry's motion for summary judgment on March 12, 2025. Dkt. No. 472. Plaintiff then settled her remaining claims against Henry and stipulated to their dismissal on June 15, 2025. Dkt. No. 523. Accordingly, judgment is entered in favor of Fox News on Plaintiff's claims against it.

**Dated:** New York, New York

      June 16, 2025

                                      **TAMMI M. HELLWIG**
                                     _____
                                        **Clerk of Court**

                   **BY:**     K. mango

                                        _____
                                        **Deputy Clerk**